232 Cal.App.3d 849 (1991)
283 Cal. Rptr. 788
In re AMY M. et al., Persons Coming Under the Juvenile Court Law.
DARDELL McFARLIN, as Chief Probation Officer, etc., Plaintiff and Respondent,
v.
THOMAS M. et al., Defendants and Appellants.
Docket No. H006375.
Court of Appeals of California, Sixth District.
July 23, 1991.
*854 COUNSEL
S. Clay Bedford and Diane A. Baker, under appointments by the Court of Appeal, for Defendants and Appellants.
Leo Himmelsbach, District Attorney, Robert J. Masterson, Deputy District Attorney, Steven M. Woodside, County Counsel, and Maria De Anda, Deputy County Counsel, for Plaintiff and Respondent.
OPINION
ELIA, J.
Thomas and Dorothea M., parents of Amy and Michael M., appeal orders adjudicating their children dependents of the juvenile court. They argue on appeal that insufficient efforts were made to prevent the need to remove the children from their home; that insufficient evidence supports juvenile court jurisdiction and out-of-home placement; that Amy was not competent to testify; and that they were denied their due process rights by the juvenile court's refusal to allow them to interview or to call Michael as a witness in the proceeding. Although we find no other errors, we agree that *855 appellants' right to due process was violated by the juvenile court's failure to allow them to call Michael as a witness. Therefore, while we affirm the adjudication of dependency as to Amy, we will reverse it as to Michael.

Factual and Procedural Background
Amy was born on November 21, 1977; Michael on April 8, 1981. On April 21, 1989, Amy was placed in protective custody; the previous day she had told another child at school that her father had molested her. On April 26, a petition was filed under Welfare and Institutions Code section 300, subdivision (d).[1] The petition alleged that Amy had been sexually abused by her father, and that her parents denied that she had been abused.
Following a detention hearing on the same day, Amy was detained in the children's shelter and ordered to undergo a psychological evaluation.
On June 22, 1989, Michael was taken into protective custody, based on concerns that he was at risk for sexual abuse from the father, who was still living in the family home. On June 23, a section 300, subdivision (j) sibling petition was filed as to Michael, alleging that Amy had been sexually abused by her father, and that he still resided in the family home. Michael was released to his mother's custody on June 27, after his father had left the family home, but was returned to protective custody on June 30 when the mother violated a court order prohibiting contact between Michael and his father.
Amy and Michael were evaluated by a court-appointed evaluator; Amy's evaluation is dated June 26, 1989; Michael's is dated July 21, 1989.
Presumably on the basis of these evaluations, amended petitions were filed as to Amy and Michael on August 7, 1989. Amy was alleged to come under section 300, subdivisions (b) (physical harm), (c) (emotional harm) and (d) (sexual abuse); Michael was alleged to come under subdivision (c) (emotional harm) and (j) (sibling abuse).
A jurisdictional hearing was held over 14 days commmencing on August 17 and ending on September 7, 1989. On September 7, the court found the allegations, as amended, true and proceeded to disposition. It then adjudicated both children dependents of the juvenile court and ordered them to remain in out-of-home placement. This appeal ensued.
Appellant Dorothea M. also filed a writ of habeas corpus in this court on June 28, 1990, alleging newly discovered evidence. The petition was summarily *856 denied on August 23, 1990.[2] Further facts will be detailed as necessary to the issues on appeal.

DISCUSSION

I. Reasonable Efforts to Prevent or Eliminate the Need for Removal

(1) As respondent points out, if a child in a dependency proceeding is retained in out-of-home custody, both state and federal law require a finding as to whether reasonable efforts were made to prevent or eliminate the need for removing of the minor from his or her home and whether there are available services which would prevent the need for further detention. (§ 319; 42 U.S.C. § 671 (a)(15).) Although the juvenile court made a finding to this effect on the record, appellants argue that reasonable efforts were not made. We disagree.
A reasonable efforts finding must be made based on the particular circumstances of a case. (In re Michael S. (1987) 188 Cal. App.3d 1448, 1458 [234 Cal. Rptr. 84].) Here, Amy was taken into protective custody in April 1989 after she revealed at school that her father had sexually molested her. When Amy told her mother she had revealed the molestation at school, the mother failed to act on this information. Amy also recounted that she had previously told her grandfather and grandmother of the molestation, and that they had relayed this information to Amy's mother several months before. The mother continued to deny the possibility that Amy had been molested by her father, however.
Michael was taken into protective custody when Dr. Sherwood, after evaluating Amy, expressed her concern for the potential that Michael might be molested by his father. Michael was returned to his mother's custody at the detention hearing under an order prohibiting any contact with his father, but was returned to protective custody when his mother knowingly violated this protective order only two days later.
We find it difficult to conceive what efforts could have been proferred to prevent or eliminate the necessity of removing the children from their home; Amy was clearly at risk of continuing abuse, and Michael was at risk of abuse if his mother failed to protect him, which she was unwilling or unable to do. Under these circumstances, we find the statutory requirements were met.

*857 II. Juvenile Court Jurisdiction

Appellants challenge juvenile court jurisdiction over their children on several grounds. We will first examine the arguments which pertain to Amy, then as they pertain to Michael.

A. Amy

1. Competency to Testify

Appellants first argue that Amy was incompetent to testify. Evidence Code section 700 states: "[E]very person, irrespective of age, is qualified to be a witness...." Evidence Code section 701, subdivision (a) disqualifies any person who is "(2) Incapable of understanding the duty of a witness to tell the truth." The court is the arbiter of a witness's competency. (Evid. Code, § 405.) (2) A court's ruling that a witness is competent to testify will not be reversed on appeal absent an abuse of discretion. (In re Crystal J. (1990) 218 Cal. App.3d 596, 601 [267 Cal. Rptr. 105].)
The juvenile court ruled that Amy should testify in chambers, outside the presence of her parents, as provided by section 350. Mother's counsel asked permission to voir dire Amy on her competency to testify, and the juvenile court indicated it wished to reserve that decision. Amy's counsel then asked Amy whether she knew the difference between the truth and a lie. Amy responded that she did. She then promised to tell the truth in her testimony. The juvenile court denied father's request to voir dire Amy further on this issue, but indicated it would allow him this opportunity on cross-examination. This procedure is permissible under Evidence Code section 701, subdivision (b) in nonjury proceedings.
At the close of direct testimony, the court again reserved its ruling on Amy's competency until cross-examination had been completed. Mother's attorney did not voir dire Amy on cross-examination; father's attorney did.
At the beginning of cross-examination, when mother's counsel was questioning Amy about when she had seen her mother, Amy testified that her mother was telling lies and talking about her. She went on to relate that her mother had come to her foster home at night for four weeks the previous month and sat on her bed and they had talked. Amy went on to explain that now that she was staying at the home of her foster mother's mother, her mother did not come at night any more. Amy knew her mother was telling lies about her behind Amy's back, however, because her guinea pig had told her. Amy went on to explain that the guinea pig came and visited her once a week at night and told her what her mother was saying, and what happened *858 around her house. She also testified that the guinea pig would kill her (she would bring "my mom's knives" and "slit [her] throat") if Amy told what the guinea pig had said last time she visited.
Later on cross-examination father's counsel questioned Amy about an incident when she had imagined that she saw blood in the bathtub. Amy testified that she felt like crying because "I was staring at the carpet and I saw it.... I saw it rehappen ... Me going to turn on the water and blood came out." Amy then volunteered "I just saw Molly [her guinea pig] on the shelf." Amy's counsel then requested a recess. Amy was later asked by father's counsel if she would lie about her dad. Amy answered she would, but only because "he lies about me." Amy said that she would not lie about her mom, that she had not lied about her dad, and that she was telling the truth. She said she would lie about her father if he tried to come into chambers because she was terrified of him.
After her testimony concluded, mother's counsel asked the juvenile court to make a finding that Amy was not competent to testify "on the basis that it is clear from her testimony today that she does not know the difference between right and wrong." The motion was joined by father's counsel.
The juvenile court ruled: "I find that [Amy] is quite believable and quite competent to testify under oath. Obviously these fantasies bear looking into. If there's testimony along the lines to explain the fantasies, I'll consider it. [¶] We all know that children have fantasies, and just because the child fantasizes about one thing doesn't mean what they say about something else isn't the truth. [¶] Granted this is to be considered. [¶] The matter about lying, that was quite qualified with what she said. I don't believe she said she would lie in this case. That is the ruling."
(3) We agree. We have reviewed all of Amy's testimony and conclude that the juvenile court's finding that Amy was a competent witness was not an abuse of discretion. Amy testified for almost eight hours over two and a half court days; her testimony occupies almost three hundred fifty pages of reporter's transcript. She testified in great detail about the six years of molestation by her father. Other than the above described hallucinations, which represented only a small fraction of Amy's total testimony, the testimony was lucid, candid and consistent.
The court-appointed evaluator, Dr. Sherwood, testified that Amy can "accurately perceive and explain the basis of her perceptions" and was not schizophrenic. She had found Amy oriented to time and place, having a good memory, and not easily led in interviews. In her opinion, Amy's hallucinations during cross-examination were typical symptoms of post-traumatic *859 stress disorder and they indicated the extreme stress she was under. Dr. Sherwood also testifed that in her experience, young children who are molested do hallucinate, and that hallucinations were not themselves necessary indicators of a thought disorder. Hallucinations only indicated a psychotic disturbance when associated with gross reality impairment; she had found none in Amy.
We conclude it was reasonable for the juvenile court, given this evidence, and having listened to the totality of Amy's testimony, to have determined she was competent to testify.

2. Due process

Appellants next argue that their right to due process was violated by the juvenile court's failure to allow them access to the children prior to the hearing, and in Amy's case, by the failure of the court to provide an opportunity to have Amy's testimony read back to them, so that they could help plan Amy's cross-examination.
We will discuss this argument in greater detail as it pertains to Michael. (4) As it pertains to Amy, we cannot agree that the court's restrictions on access to her violated appellants' right to due process. Amy testified extensively, was cross-examined at length, and appellants' expert was present for part of her testimony. Appellants, their counsel, and their expert had all received the psychological evaluation performed on Amy by Dr. Sherwood. And, contrary to appellants' contention, the court had the reporter read the transcript of Amy's testimony back to them on the first day of her testimony, and on the second day, the court granted a recess in order to allow appellants' counsel the opportunity to summarize Amy's testimony. Under these circumstances, appellants were given a meaningful opportunity to be heard, and we cannot conclude that their right to due process was violated.

3. Sufficiency of the Evidence

(5) The petitioner in a dependency proceeding must prove by a preponderance of the evidence that the child who is the subject of a petition comes under the juvenile court's jurisdiction. (§ 355.) On review, this court will view the juvenile court record in the light most favorable to that court's order. (In re Katrina L. (1988) 200 Cal. App.3d 1288, 1297 [247 Cal. Rptr. 754].) We may not reweigh or express an independent judgment on the evidence, but must decide only whether sufficient evidence supports the findings of the juvenile court. (In re Laura F. (1983) 33 Cal.3d 826, 833 [191 Cal. Rptr. 464, 662 P.2d 922].) Issues of fact and credibility are matters for *860 the trial court alone; we may decide only "`"whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trier of fact." [Citation.]'" (In re Heather P. (1988) 203 Cal. App.3d 1214, 1226-1227 [250 Cal. Rptr. 468], quoting In re Cheryl H. (1984) 153 Cal. App.3d 1098, 1132 [200 Cal. Rptr. 789].) With this standard of review in mind, we examine appellants' next argument, that insufficient evidence supports juvenile court jurisdiction over the children.
(6) The amended petition as to Amy alleged that she came under the purview of section 300, subdivisions (d) and (c), in that she had been sexually abused by her father, that her mother had failed to protect her from this abuse, and that she had suffered emotionally as a result of her parents' conduct. Overwhelming record evidence supports these grounds for juvenile court jurisdiction over Amy.

a. Sexual molestation

The amended petition alleged that the sexual molestation, which began when Amy was five years old, included oral copulation, anal intercourse and fondling. Amy's testimony on this issue, as we have already discussed, was consistent and very specific. Amy testified that starting when she was five and in kindergarten, her mother would take her home from school for lunch and a nap and her father would come home from work early. The father watched Amy in the afternoons while her mother sold Tupperware. In the beginning, the father would nap with Amy; he would be dressed, and she would have her panties on. Sometimes, the father took his clothes off, and sometimes he would have her lick his penis. It was "big" and "soft," but "it would get hard." In first grade, the father would rub his penis between Amy's legs, and something came out of his penis, "kind of like a yellow substance" which was "sticky" and "warm." This happened while Michael was taking a nap.
When she was around 10, the father sometimes sodomized her while she was lying on her stomach on the bed. He would put a clear lubricant on his penis before he did this; it came from an aluminum tube which he took from the corner of his side of the bed. She testified that the act was painful. Amy's father told her "`don't worry it will be over in a minute." Amy also testified that her father put his mouth on her; he licked her buttocks.
The father told Amy not to tell anyone about this; when she was younger he said if she ever told anyone he would kill her. Sometimes Amy would avoid her father by pretending to be asleep or doing her homework.
This testimony was corroborated by medical evidence in the form of testimony by Dr. Kerns, a specialist in child sexual abuse evaluations. Dr. *861 Kerns testified that his assistant had examined Amy and based on a colposcope photograph the assistant had taken, it was his opinion that Amy had suffered an injury to her anus. The photograph showed a red lesion which, in Dr. Kerns's opinion, was caused by force and which was consistent with anal penetration by a penis. Although an injury like Amy's could be caused by severe constipation over a long period of time, it was not typical of what such an injury would look like. Severe constipation lasting months and causing bleeding might lead to superficial, narrow anal fissures; Amy's injury was 5-6 mm. in length and 1-2 mm. wide, 5 times wider than a typical fissure caused by constipation. In Dr. Kerns's opinion, there was no question that trauma caused Amy's injury. It could not have been self-inflicted, and in his opinion, it was not caused by constipation. Neither was there any history of an accidental penetrating injury.
Dr. Kerns testified that such an injury would have an effect on bowel movements afterwards; they would reaggravate the injured tissue. It could take months or years for such an injury to heal because of this continuing irritation. In the doctor's opinion, Amy's injury could have been as young as several hours old, but was more probably days or weeks old. With recurrent irritation, it could have been older. Half of such injuries would heal within a year.
This medical evidence was consistent with Amy's testimony that her father had started sodomizing her at the age of 10, and that she had trouble thereafter with her bowel movements. Although she told her mother about this problem, the mother did not seek medical help.
Dr. Kerns also testified he had reviewed a medical report which stated that Amy had pain with her bowel movements and, while she was in the children's shelter, had found blood on her toilet paper after a bowel movement. Amy testified she had not been sodomized since June 1988, about eight months prior to the medical examination. In Dr. Kerns' opinion, the nature and extent of Amy's injury was consistent with this history.

b. Mother's failure to protect Amy

Amy lived with her maternal grandparents near Bakersfield during the summer and fall of 1988. She testified that in August 1988 while she was sitting on her grandfather's lap, her grandfather laid his hand on her leg, and "my legs were opened." The following day, her grandfather asked Amy if anyone had touched her where she didn't like it, and in reply she had "started telling him all this stuff." Amy's grandfather told her that "if I had been touched by my father if I had tell [sic] anyone I would be taken away." Amy's grandfather then apparently told Amy's grandmother, and Amy's *862 grandmother reiterated the same threat when she and Amy talked: "They said that I would be taken away from my parents and never be able to see them...." During a visit home two weeks before school started, Amy's mother told Amy that her grandparents had revealed the molestation. Amy's mother had told Amy that she was going to attend school that fall in Bakersfield because she wasn't safe at home. Amy's mother had said Amy would be able to come home to San Jose "when daddy got better."
Amy's grandfather testified that during the fall of 1988 Amy made molest allegations one day at school. When her grandparents went to the school, however, Amy retracted the allegations in front of the teacher and the school principal.
Amy's mother testified that in April 1989 Amy told her that she had revealed at school that "`dad raped me.'" It was difficult for Amy to say this; Amy was very upset. In response, Amy's mother told Amy that the accusations were very serious, and that "children were taken away and put in a shelter for an unknown period of time. That she could split the family up. Make the parents lose their jobs over this. That there were just a lot of really serious things that could happen...." Instead of taking Amy's allegations seriously, expressing concern or calling the police, Amy's mother called her husband. That night she left Amy with her father while she attended a class.
Amy told her mother she would be talking with authorities at school the following day, but Amy's mother dropped her off at school and proceeded to her place of work. When she returned to pick up Amy at school that afternoon, she spoke with the police, who told her that Amy was being placed in protective custody.

c. Emotional harm

Dr. Dyane Sherwood, the court-appointed evaluator who was qualified as an expert in the evaluation and treatment of sexual abuse and molestation, testified that she had diagnosed Amy as suffering from posttraumatic stress disorder.
A person suffering from this disorder must have experienced a markedly distressing event outside the common range of human experience  in this case Amy's allegations of sexual molestation and her fear that her father would kill her if she revealed it. Second, Amy was suffering from symptoms consistent with this diagnosis: She couldn't stop thinking about the molestation; she suffered from nightmares expressing her fears of her father, including having her head cut off and her throat slit; she experienced *863 hallucinations, illusions, and dissociation; she tried to avoid feelings about the trauma because she did not want it on her mind; she had a markedly diminished interest in activity and was very depressed; and she felt detached and estranged from other people. She had also had difficulty sleeping, outbursts of anger, difficulty concentrating, and was extremely anxious, fearful and hypervigilant. Amy also had an eating disorder, which Dr. Sherwood viewed as another response to the trauma. In the past, Amy had exhibited sexualized behavior (she masturbated in school), and had practiced self-mutilation (she "hurts the cuticles of her nails.") In Dr. Sherwood's opinion, Amy was a suicide risk. Sherwood had been unable to find any alternate diagnosis that fit Amy's behavior.
Dr. Sherwood also testified that Amy's hallucinations about her mother visiting her in the foster home indicated a deprivation of nurturing, and Amy's longing for nurturing from her mother. In the doctor's opinion, Amy was distressed by her mother's lack of protection, and upset that her mother did not believe her. Appellants' expert witness, Dr. Coleman, did not dispute this evidence of emotional harm to Amy.
We have no difficulty concluding that substantial evidence supports the juvenile court's jurisdictional finding over Amy.

B. Michael

1. Due Process

As to Michael, appellants argue first that their right to due process was violated by the juvenile court's refusal to allow them to call Michael as a witness or to allow their counsel or expert to examine him, and that this violation mandates reversal of the jurisdictional finding.
On the first day of the contested jurisdictional hearing, children's counsel notified the court that she did not intend to call Michael as a witness. Parents' counsel then moved to have Michael produced as a witness on behalf of their clients. When opposing counsel objected, questioning both whether Michael's presence was necessary given the nature of the allegations in the petition and whether his testimony would cast any light on those allegations, the juvenile court decided it would rule on the motion after hearing testimony by the court-appointed evaluator, Dr. Dyane Sherwood. Parents' counsel then moved for permission to have their expert examine the children, and the court denied this motion. Parents' expert and Dr. Sherwood were both present during part of Amy's testimony, however, as we have noted.
*864 Dr. Sherwood testified that it would be stressful for Michael to testify because he was under significant psychological stress, was repressing fantasies, was frightened and was concerned about what he might say. It was her opinion that Michael would suffer additional emotional harm if he testified. After Dr. Sherwood's testimony, the juvenile court ruled that "I don't think in this case balancing what this child could do or could say versus what the damage to the child.... I don't think it makes any sense to have this child in here and the motion is denied." We agree that the court's refusal to allow appellants to call Michael as a witness was a denial of their right to due process and that this constituted reversible error.
(7) Dependency proceedings are civil in nature, and are designed to protect children rather than to prosecute parents. (§ 300; In re Corey A. (1991) 227 Cal. App.3d 339, 346 [277 Cal. Rptr. 782]; In re Kerry O. (1989) 210 Cal. App.3d 326, 333 [258 Cal. Rptr. 448]; In re Mary S. (1986) 186 Cal. App.3d 414, 418 [230 Cal. Rptr. 726].) "The fundamental and crucial right to `conceive and raise one's children' is protected by due process guarantees. (Stanley v. Illinois (1972) 405 U.S. 645, 658 [31 L.Ed.2d 551, 562-563, 92 S.Ct. 1208]; In re Kelvin M. [1978] 77 Cal. App.3d 396, 400 [143 Cal. Rptr. 561].) `[T]he interest of a parent in the companionship, care, custody, and management of his children is a compelling one, ranked among the most basic of civil rights [citations], [and] the state, before depriving a parent of this interest, must afford him adequate notice and an opportunity to be heard.' (In re B.G. (1974) 11 Cal.3d 679, 688-689 [114 Cal. Rptr. 444, 523 P.2d 244].)" (In re Brendan P. (1986) 184 Cal. App.3d 910, 915 [230 Cal. Rptr. 720].)
As in other civil cases, parties to a dependency proceeding have a statutory due process right to cross-examine and confront witnesses. (In re Malinda S. (1990) 51 Cal.3d 368, 383 at fn. 16 [272 Cal. Rptr. 787, 795 P.2d 1244]; In re Corey A., supra, 227 Cal. App.3d at p. 346; In re Kerry O., supra, 210 Cal. App.3d at pp. 333-334; In re Mary S., supra, 186 Cal. App.3d at pp. 418-419; §§ 311, subd. (b), 341, 353; Cal. Rules of Court, rule 1449(b)(3), (4).)[3] Although appellants have not specifically argued that their right to confront Michael was violated, the confrontation issue is analogous to the due process right they allege here.
Section 341 and rule 1449(b)(4) allow parents the right to compulsory process to compel the attendance of witnesses. (See also § 353.) We will thus evaluate the juvenile court's refusal to allow Michael to be called to testify against this specific statutory and rule authority, and the general agreement on the existence of a due process right in dependency cases.
*865 (8) The amended petition alleged that Michael was suffering emotional damage (§ 300, subd. (c)) and that he was at substantial risk of suffering emotional harm since Amy had been sexually abused (§ 300, subd. (j)). On appeal, respondents concede that the juvenile court had no jurisdiction over Michael under subdivision (j), since that subdivision does not include allegations of emotional harm based on sibling abuse. The sole remaining basis for juvenile court jurisdiction over Michael was the emotional damage allegation.
We do not think appellants' due process argument is met by the answer that Michael's presence was unnecessary to determine whether or not this allegation was true. The basis for the court's true finding was Dr. Sherwood's testimony, which was based in turn on her evaluation of Michael. What Dr. Sherwood found, as we have already detailed, was a child who "presented" as a rather normal eight-year-old boy, but who in testing was revealed to be suffering from low self-esteem, and who showed signs of a fundamental thought disorder. This evaluation was partly corroborated by the testimony of probation officer Winchester regarding Michael's lack of emotion on being removed from his parents' custody.
To rebut this testimony, appellants offered the testimony of their expert, Dr. Coleman. Dr. Coleman disputed the validity of the tests used in Dr. Sherwood's evaluation, and the conclusions she drew from the test results. It was Dr. Coleman's opinion that the etiology of Michael's psychological distress was his removal from the family home and from his mother's custody. By refusing to allow Michael to be called as a witness, the juvenile court refused appellants the opportunity to use his testimony to further impeach Dr. Sherwood. Conversely, Michael's testimony might have verified Dr. Sherwood's conclusions. And the juvenile court was prevented from evaluating the experts' testimony in light of Michael himself.
Neither was there in this case any substitute for Michael's testimony which might have satisfied due process. Unlike Kerry O., Michael had not testified in a prior hearing, thus there was no substitute for his testimony that could have been admitted into evidence. Neither was there any report containing Michael's statements which could have substituted for his testimony. In addition, there was no suggestion that Michael would have been incompetent to testify, and the court refused to allow appellants' counsel or their expert to interview or evaluate both children prior to the hearing.
*866 We cannot conclude, alternatively, that Michael was an unavailable witness under Evidence Code section 240.[4] There is mention in at least one appellate opinion that a child witness in a dependency proceeding was unavailable under this statute. (See In re Christina T. (1986) 184 Cal. App.3d 630, 634 [229 Cal. Rptr. 247].) Had Dr. Sherwood testified that Michael's trauma resulted from the alleged sexual molestation of Amy in addition to testifying that Michael would not be able to testify without substantial trauma, the juvenile court could conceivably have found that Michael was an unavailable witness. Since it was never asked to make such a finding, however, it would be presumptuous of this court to construe Dr. Sherwood's testimony as sufficient to meet the statutory requirements. In the absence of a request to find Michael unavailable, and of record evidence which meets the requirements of Evidence Code section 240, we decline to hold that Michael was an unavailable witness.
We note that the United States Supreme Court recently upheld the propriety of a child abuse victim's testifying via closed circuit television (Maryland v. Craig (1990) ___ U.S. ___ [111 L.Ed.2d 666, 683, 110 S.Ct. 3157, 3167]) against a challenge that such a procedure violated a defendant's right to confrontation. The court noted that it had recognized as "compelling" a state's interest in protecting minor victims of sex crimes from further trauma and embarrassment, and concluded that "a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh" the right to confrontation, in at least some instances. (Ibid.) The court also noted the diverse protections enacted by "a significant majority of states" to avoid the trauma child victim-witnesses experience in testifying.
In California, these include section 350 subdivision (b), (see also rule 1412(c)) which allows a court, under certain conditions, to take the testimony of a minor in chambers. This procedure was utilized when Amy testified. Appellants' counsel was present and had an opportunity to cross-examine Amy, and a court reporter transcribed the testimony. California courts have held this procedure does not violate due process. (In re Katrina *867 L., supra, 200 Cal. App.3d at p. 1298; In re Mary S., supra, 186 Cal. App.3d at pp. 417-418; In re Stanley F. (1978) 86 Cal. App.3d 568, 574-575 [152 Cal. Rptr. 5].) A similar procedure could have been used to protect Michael while testifying. Section 350 gives a juvenile court no authority to refuse to allow a child to be called as a witness, however, and the Supreme Court's list in Maryland v. Craig did not include the option of the child's not testifying.
We also reject respondent's argument that the juvenile court had the authority to protect Michael by refusing to allow him to be called as a witness. As we have noted, Dr. Sherwood testified that Amy, who testified extensively over three court days about the six years she was molested by her father, was hallucinating under the stress of testifying against him. Conversely, Michael, who petitioner conceded would testify he was not molested, was protected from testifying altogether on the grounds of potential trauma. Any argument that Michael, who was alleged to have been suffering emotional harm as a result of Amy's molestation and his mother's failure to protect him, would be traumatized by testifying would apply with much more force to Amy, so emotionally damaged by her molestation that she is now suicidal and hospitalized. But Amy did testify, and we believe appellants had the right to call Michael to the witness stand. And while we conclude the juvenile court had no authority to deny appellants this right, we recognize the trauma a child may suffer in testifying. We take some comfort in the knowledge that section 350 allows the juvenile court to protect children from the additional trauma of confronting abusive parents.
(9) Having concluded that the juvenile court's refusal to allow appellants to call Michael as a witness violated due process, the question remains whether this violation requires this court to vacate the jurisdictional order. Appellants cite In re Brendan P., supra, 184 Cal. App.3d 910, in which appellant father received notice of the jurisdictional hearing only on the day of the hearing and the father and his attorney, who lacked previous juvenile court experience, were treated as nonparticipants. (Id. at pp. 914-915.) The appellate court concluded this amounted to a deprivation of the father's due process right to adequate notice and a meaningful opportunity to be heard. (Id. at p. 916.) The court's actions deprived the proceedings of "elementary fairness so as to preclude an enforceable order.... The procedure followed by the juvenile court was fundamentally defective, void from the beginning, and cannot be upheld." (Id. at p. 920, citing In re B.G., supra, 11 Cal.3d at p. 688 [reversal of a jurisdictional order for failure to notify the children's mother, a foreign national, of the proceedings].)
In that both parents were notified of and present at the jurisdictional hearing, represented by counsel, and were able to call and cross-examine other witnesses, we do not consider the denial of their due process right to *868 call Michael to testify so fundamentally unfair as to automatically void the jurisdictional order. In light of the United States Supreme Court's recent reaffirmance of the applicability of harmless error analysis to "most constitutional errors," (Arizona v. Fulminante (1991) ___ U.S. ___ [113 L.Ed.2d 302, 111 S.Ct. 1246], we conclude that analysis should be applied here. As the Supreme Court noted, when error occurs during the presentation of a case, it can be "quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." (Id. at p. ___ [113 L.Ed.2d at p. 312].)
Applying the harmless error standard in this case, we cannot conclude that the trial court's failure to allow Michael to be called as a witness was harmless beyond a reasonable doubt. Appellants were not only denied the opportunity to have Michael testify, they were also, as we have noted, refused any access to him prior to the hearing and there was no other testimony or statements which could have been admitted into evidence to substitute for his testimony. The juvenile court had before it the testimony of Dr. Sherwood that Michael was emotionally disturbed, and the testimony of Dr. Coleman that even if this were true, it was the likely result of Michael's removal from the family home. Since Dr. Sherwood noted that Michael appeared on the surface like a normal eight-year-old boy, we cannot conclude beyond a reasonable doubt that his testimony would not have convinced the juvenile court that Dr. Sherwood's evaluation overstated or misrepresented the emotional harm to Michael. In that case, the juvenile court could have failed to make a true finding on the allegation that Michael came under section 300, subdivision (c), and there would have been no basis for juvenile court jurisdiction. We therefore conclude the jurisdictional determination must be reversed, and the cause remanded for a new jurisdictional hearing as to Michael.
We do not take lightly our decision to reverse this finding. We have taken judicial notice of the juvenile court file, and are fully cognizant of the present circumstances of the parties in this action. We are aware that Michael has not been returned to his mother's custody, although he has had consistent unsupervised visitation with her, and that a permanent plan of long-term foster care has been made for him. We are also fully cognizant that the fundamental purpose of the juvenile court law is to protect children when their parents cannot, and that Michael will suffer an extended period of impermanency as a result of our decision. But fundamental rights are implicated in dependency proceedings, and they cannot be abrogated with impunity. While we deeply regret the necessity of sending this case back for a new jurisdictional finding almost two years after a finding was made on the original petition, we conclude this course is necessary to ensure that the due process rights of appellants are protected.

*869 2. Sufficiency of the Evidence

Appellants also dispute the sufficiency of the evidence supporting juvenile court jurisdiction over Michael. Given our conclusion on the due process issue, we need not review this allegation of error. Since a new jurisdictional hearing may be held, however, we will review the evidence which would have supported jurisdiction, absent evidence to the contrary. On remand, the juvenile court must weigh this evidence against any other evidence presented by appellants to determine whether it is adequate to support a jurisdictional finding.
The amended petition as to Michael alleged he came under section 300, subdivisions (c) (emotional harm) and (j) (risk to child as a result of sibling abuse). On appeal, as we have noted, respondents have conceded that the juvenile court had no jurisdiction over Michael under section 300, subdivision (j). (10) The following evidence would have been sufficient to support a jurisdictional finding under section 300, subdivision (c), however.
Dr. Sherwood evaluated Michael on July 5, 1989. Her report, and her testimony, form the bulk of the evidence supporting jurisdiction over Michael. Dr. Sherwood testified that unlike Amy, Michael appeared very relaxed and casual when she met him; not depressed like his sister. The psychological tests she administered Michael, however, showed that he didn't know "how to make sense out of his world;" Dr. Sherwood felt Michael had a more fundamental disturbance than Amy. Although Dr. Sherwood had not arrived at a final diagnosis on Michael, she found indications of psychopathology in him based on the tests she administered. Test results suggested that Michael felt insecure, inadequate, withdrawn, depressed, and was hesitant to reveal his feelings. Michael's drawings revealed a lack of positive experience in Michael's family, and an impoverished emotional atmosphere. It was the doctor's impression that Michael was trying to hide; that he didn't want to be seen. Based on the Rorschach tests, the doctor opined that Michael had "great difficulty staying  referring to the reality in front of him, in forming his perception. That he tends to go inwardly to report what's going on." The test also suggested that Michael had a thought disorder, and he tended to have morbid and nonrealistic perceptions.
These were all signs of pathology; particularly signs of a major thought disorder, like schizophrenia. In the doctor's opinion, Michael was "at extreme risk for a major mental illness." The results of Michael's testing were "highly unusual and beyond the normal ups and downs and feelings of inferiority or even the things that I see in children who have been removed from their parents recently.... [¶] These are extreme findings with him *870 and suggest that he feels extremely inadequate, inferior, that he almost doesn't exist with relationship to other people." The doctor was "very concerned about Michael's ability to perceive reality accurately. He seems not  it's almost like he automatically  like he has learned to just kind of shut things out and be very inconspicuous." In the doctor's opinion, the test results were not consistent with the view of Michael as an eight-year-old with a vivid imagination.
It was Dr. Sherwood's opinion that Michael was repressing fantasies, and was frightened and concerned with what he might say. Dr. Sherwood also noted that although she gave Michael opportunities to express a wish to see his parents, he never did in the almost four hours of the interview. She considered this highly unusual.
Dr. Sherwood also expressed concern about the mother's lack of judgment and her failure to protect Amy from molestation; if Michael were at risk, the doctor felt the mother would not protect him. Dr. Sherwood opined that Michael was at risk of suffering emotional harm in the family, and had already suffered emotional harm. In her opinion, Michael would be at risk of emotional harm if he were returned to his mother's custody and his father were in jail, because his parents' explanations of things conflicted with his own perceptions of reality. In addition, the doctor's information strongly suggested a distance, and the lack of an empathetic relationship between mother and son.
The fact that Michael had difficulty perceiving reality meant that he had special needs; both needs for emotional encouragement, and the need for a predictable daily life structure that would help him feel safe, and would help him learn to assess situations accurately. Dr. Sherwood had serious reservations about the mother's ability to provide an adequate environment for Michael.
Testimony by probation officer Jill Winchester corroborated part of Dr. Sherwood's testimony. The mother had led the probation officer to believe that Michael would "fall apart" if he were removed from home. Michael expressed no emotion on being removed, however. The officer found this very unusual, and was very concerned about it. Children's shelter personnel confirmed that Michael's nonemotional behavior continued during his stay there. Not only did Michael not appear upset on being removed from his parents; he failed to show any emotion when they visited him. He displayed no interest in going with his parents. The probation officer also expressed concern about the risk of emotional harm to Michael if he were returned home, based on her poor opinion of the mother's judgment, and the fact that she had never seen the mother put her children's needs above her own.

*871 3. Michael's Placement in Out-of-home Custody

Since Michael was not returned to his mother's custody except for a two-day period following the detention hearing, it is appropriate for us to examine appellants' argument that insufficient evidence justified his removal from his mother's custody, since after his father was incarcerated, Michael was no longer at risk of being molested.
The standards for removing a child adjudicated a dependent of the juvenile court from his or her parents' custody are enunciated in section 361, subdivision (b). The findings required by this subdivision must be made on the basis of clear and convincing evidence. Section 361, subdivision (b)(3) contains the same language as does section 300, subdivision (c). Appellants argue that clear and convincing evidence does not justify Michael's removal from home on these grounds.
Appellants' argument on this issue incorporates the same points they make against the jurisdictional findings as to Michael. We need not, therefore, detail again those facts from which we would have found a sufficient basis for jurisdiction. (11) We need only add that the findings which would have supported jurisdiction over Michael supported his removal from his mother's custody by clear and convincing evidence: Michael's problems with reality perception were exacerbated rather than helped by his parents; there was a lack of an empathetic relationship between mother and son; there was an impoverished emotional atmosphere in the home and a lack of emotional support for Michael; and the mother had poor judgment, was unable to provide an adequate environment and was unable to put her children's needs above her own. We find this sufficient evidence to justify Michael's removal from his mother's custody.

Disposition
The order adjudicating Amy M. a dependent of the juvenile court is affirmed. The order adjudicating Michael M. a dependent of the juvenile court is reversed, and the cause is remanded for further proceedings consistent with this opinion. Michael is to remain in his current placement pending further order of the juvenile court.
Premo, Acting P.J., and Cottle, J., concurred.
A petition for a rehearing was denied August 13, 1991.
NOTES
[1] All further section references are to the Welfare and Institutions Code unless otherwise noted.
[2] On September 4, 1990, Dorothea M. filed a petition for review in the California Supreme Court; it was denied on October 10, 1990.
[3] All further rule references are to the California Rules of Court unless otherwise noted.
[4] Evidence Code section 240, subdivision (a)(3), includes in the definition of unavailability a declarant who is "[d]ead or unable to attend or to testify at the hearing because of then existing physical or mental illness or infirmity." Subdivision (c) states: "Expert testimony which establishes that physical or mental trauma resulting from an alleged crime has caused harm to a witness of sufficient severity that the witness is physically unable to testify or is unable to testify without suffering substantial trauma may constitute a sufficient showing of unavailability pursuant to paragraph (3) of subdivision (a). As used in this section, `expert' means a physician and surgeon, including a psychiatrist, or any person described by subdivision (b), (c), or (e) of Section 1010." Evidence Code section 1010 defines "psychotherapist" to include "(b) A person licensed as a psychologist under Chapter 6.6 ... of Division 2 of the Business and Professions Code."