Filed 1/5/26  C.D. v. Superior Court CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| C.D. et al., | G066000 |
| Petitioners, | (Super. Ct. Nos. 23DP0497, 23DP0497A, 23DP0498, 23DP0498A, 23DP1118) |
| v. | |
| THE SUPERIOR COURT OF ORANGE COUNTY, | O P I N I O N |
| Respondent; | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY et al., | |
| Real Parties in Interest. | |

Original proceedings; petitions for a writ of mandate to challenge orders of the Superior Court of Orange County, Daphne Grace Sykes, Judge. Petitions denied.

Sunny Dillon, under appointment by the Court of Appeal, for Petitioner C.D.

Sara Nakada, Public Defender, and Brian Okamoto, Deputy Public Defender, for Petitioner A.L.

No appearance by Respondent.

Leon J. Page, County Counsel, Debbie Torrez and Aurelio Torre, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

No appearance for the Minors.

*   *   *

A.L. (Father) and C.D. (Mother) petition for a writ of mandate overturning an order terminating family reunification services and setting a permanency plan hearing. The parents contend the court wrongly decided to exclude the testimony of their eldest child, A.A., at a status review hearing. We discern no abuse of discretion and deny the petitions.

FACTS

I.

THE PARENTS' DOMESTIC VIOLENCE TAKES AN EMOTIONAL TOLL ON A.A.

This family has a long history of violence. Father was arrested in 2017 for physically abusing Mother. (*In re A.A.* (Dec. 16, 2022, E078449) [nonpub. opn.].) Mother obtained a protective order against Father in 2020, who was later convicted of domestic battery.

In 2023, in the presence their children, the parents engaged in three "'brawl[s]'" with other adults in the home. In the third brawl, Mother put her youngest "child down at an unknown location and continued fighting with [a] 17-year-old minor." "[T]he mother and the minor sustained multiple injuries" and "[F]ather also sustained several injuries including cuts and bruises and was unable to open one of his eyes because of the swelling."

That same year, a fellow tenant "removed the parent's bedroom door because the father had broken it during a domestic dispute[] between him and the mother."

2

In 2024, police responded to a fight between the parents and the paternal grandmother, who was the children's caregiver. The grandmother reported Mother "'shoved' [A.A.] into the bathroom" and closed the door on the grandmother's arm; the grandmother said "'you are hurting me.'" Mother claimed the grandmother punched her.

Later that year, a hospital employee reported seeing Father "push[] and pin[]" Mother into a vending machine. The employee later couldn't recall that specific act but did remember seeing Father "standing over" Mother, "yelling at her face" from six inches away.

In February 2025, the grandmother reported Father had "grabbed a piece of candy from [his youngest daughter]'s right hand and threw it at" the grandmother, hitting her eye.

In August 2025, Mother's landlord "shared the parents would often fight, yell, and the father would hit the mother several times"; "the mother would scream after the father would hit the mother . . . ." The landlord stated "about three weeks ago, she told her husband to contact the police after they heard the mother scream in terrible pain"; the landlord's relative "witnessed the father grabbing the mother from her chest and quickly letting her go."

Meanwhile, the parents' conflict damaged the emotional health of A.A., who also suffered from the most severe type of sickle cell anemia. During the parents' 2023 conflict with their neighbors, A.A. began hyperventilating because of the violence and needed medical care. During the parents' 2024 conflict with the grandmother, A.A. was "'screaming and crying and reportedly had a panic attack.'" By 2025, A.A.'s grandmother reported the child would have "'snapping moments' with her siblings and get[] easily irritated." A.A. told the family's assigned social worker that visits by the

3

parents gave her "extreme anxiety." A.A. also said she "d[id] not want [her] parents to hear her testimony," and did "not feel comfortable with the parents being present during her testimony."

With this pattern of violence in mind, we turn to the procedural history. After this matter was transferred from Riverside County with a case plan aimed at the parents "gain[ing] insight on . . . domestic violence," the Orange County juvenile court sustained a supplemental petition in 2023 that alleged the "parents continue[d] to engage in acts of domestic violence" and "demonstrated that they are unwilling to protect the children . . . from being exposed to domestic violence." The children were taken into protective custody and placed with the grandmother. The parents were granted supervised visitation and offered case plans including counseling, therapy, a domestic violence prevention plan (for Mother), and anger management (for Father).

In January 2025, the juvenile court commenced a status review hearing (Welf. & Inst. Code, §§ 366.22; 366.25)[1] combined with a hearing on the Agency's petitions to change visitation (§ 388). The social worker recommended termination of reunification services, noting neither parent had learned from them. The social worker stated: "there's been ongoing incidents with the parents engaging in domestic violence. The one that happened at the . . . [h]ospital, that was the incident where Mom didn't set appropriate boundaries by staying away from the father or ending that relationship and just be able to co-parent with him."

The social worker recounted "[t]he children have voiced that during the visit, the father curses, raises his voice to the mother, is rude to

_____

[1] All undesignated statutory references are to this code.

the mother," "which makes them anxious, scared and sad." Yet A.A. and her six-year-old sister both wished to return to their parents. The social worker testified the parents' therapist said "the parents were good actors," meaning "the parents presented themselves well during the therapy sessions" and "know how to 'play the system.'"

## II.

### THE COURT EXCLUDES A.A. FROM TESTIFYING

When Father subpoenaed the nine-year-old A.A. to testify at the continued hearing in May 2025, minor's counsel objected. She asked for an offer of proof from Father and that "testimony be taken in chambers." Father's counsel responded: "Credibility, Your Honor, in terms of what was said to the social worker. I need to verify whether those statements were actually made and that's how she felt and actually explore that as well."

The court ordered A.A. back for a continued hearing. It stated: "If the Court does decide that the child will be called -- she's like nine. She just turned nine. [¶] If the Court decides . . . that she will testify, we'll do it by a softer, gentler approach. [¶] We'll have her here, and we'll have the parents someplace else where they can still see what's going on with her."

At the continued hearing, minor's counsel objected "to [A.A.] being called to testify" at all. Counsel explained: "This is a young child who is medically fragile. My understanding is that Father wants to call her to testify as to her credibility. . . . [¶] She's a young child. She has -- I've talked to her. She is extremely scared, and I am concerned that trying to examine her under this environment would not be good for her emotional or mental health. I believe that the social worker has asked her these -- the questions in the report out of the presence of her parents, her grandmother -- the caregiver. [¶] I don't believe that there will be any beneficial evidence

5

provided by [A.A.]'s testimony today. I'm asking -- I have asked or I will ask for Father's counsel to provide the offer of proof as to what he's trying to gain from the minor's testimony."

Neither parent objected to minors' counsel's representations about A.A.'s emotional health.[2] Instead, Father's counsel stated he wanted to examine A.A. to see whether "the grandmother has been coaching the child" and whether the social worker is accurately documenting what A.A. told her. Mother's counsel added the "visitation summaries don't corroborate what the social worker, the care[giver] and what the social worker is reporting the child is saying," as "there has been no mention of the parents fighting, arguing" during visits. Both parents asserted a right to cross-examine A.A.

The court acknowledged the parents' due process right to confront witnesses, noted the right "is not absolute," took a recess, then denied the parents' request to call A.A. It "looked back briefly on the history of this case, and it goes back a bit." It walked through A.A.'s emotional fragility. It noted: "In 2023 there was domestic violence that occurred in this child's presence. This child began to hyperventilate and needed medical treatment." It continued: "This child is presently doing poorly in school. She has episodes of . . . quote, 'snapping.' Her anxiety is high. She has said explicitly she does not want her parents to hear her testify. She has been diagnosed with anemia category SS, which is the most severe type of sickle cell." It concluded: "for that nine-year-old child to testify under these conditions and with her medical status and her emotional status that it would be detrimental to her, and the Court is not going to allow it."

_____

[2] The parents thus forfeited any error. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 426 [error forfeited by failure to object].)

6

Testimony by the social worker continued. She agreed with counsel that A.A. had "been consistent in saying that the parents fight during visitation," noting the visitation monitors stay 50 to 100 feet or more from the parents and "can't hear what the parents are saying."

The final two witnesses were from the visitation service. Its program director stated she was unaware of any incident reports regarding Mother. A visitation monitor testified that, although she could not overhear the conversations, the children appeared to enjoy visiting Father and did not look anxious.

The status review hearing concluded in September 2025 with oral arguments. The Agency emphasized the recent information from Mother's landlord about "the parents' fights" and "the father hitting the mother," to argue the parents had not "resolved the domestic violence issues that were existing in 2023 and 2021 when the family first came before the Court." Minors' counsel joined the Agency's position.

The juvenile court agreed with the "positions" and "analysis of the facts" by SSA and minors' counsel. It found reasonable services had been provided and that both Mother's and Father's progress toward "alleviating or mitigating the causes necessitating placement" had been moderate. The court terminated reunification services, ordered that the children were not to be returned to the parents, and set a permanency plan hearing.

DISCUSSION

Given the "overriding objective of the dependency hearing—to preserve and promote the best interests of the child," a parent's right to call the child as a witness can be outweighed by the need to protect the child from psychological harm. (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1088–1089.) While the court "must engage in 'a careful weighing of the interests involved,'

7

including a parent's right to call and cross-examine witnesses," it "has discretion to refuse to require a child to testify . . . if the material effect of the child's testimony on the relevant issues is outweighed by the psychological injury the child risks by testifying." (*In re Daniela G.* (2018) 23 Cal.App.5th 1083, 1091, 1092 (*Daniela G.*).)

We find no basis for second-guessing the court's careful balancing of the competing interests.

On the one hand, there is undisputed evidence of A.A.'s emotional fragility. During the parents' 2023 conflict with their neighbors, A.A. began hyperventilating because of the violence. During the parents' 2024 conflict with the grandmother, A.A. was screaming and crying and suffered a panic attack. By 2025, A.A. told a social worker that visits by the parents gave her "extreme anxiety." A.A. also told the social worker that she "d[id] not want [her] parents to hear her testimony," and "that the parents ma[d]e her anxious and [she] d[id] not feel comfortable with the parents being present during her testimony." The court could reasonably conclude that testifying would risk psychological injury to A.A.

On the other hand, A.A.'s proffered testimony is not especially material. Regardless of any "coaching" by the grandmother or the social worker's alleged bias, there was ample information about the ongoing domestic violence from independent sources. There were credible reports from housemates, neighbors, hospital staff, and the landlord. Impeaching A.A. would not undermine their accounts.

Thus, this is not a case where there was "no substitute for [minor's] testimony that could have been admitted into evidence." (*In re Amy M.* (1991) 232 Cal.App.3d 849, 865.) Because testifying threatened A.A.'s

8

emotional well-being and her testimony was not uniquely probative, the court permissibly exercised its discretion to exclude her from testifying.

Mother contends the court should have ordered A.A. to testify in chambers pursuant to section 350, subdivision (b), as it initially considered. "But the court was not required as a matter of law to use this procedure." (*Daniela G., supra*, 23 Cal.App.5th at p. 1090.) The court retained inherent discretion to exclude A.A. altogether, which it permissibly exercised.

In any event, any error in excluding A.A. would have been harmless under any arguable standard.[3] There is no indication that impeaching A.A. could have affected the ruling. To the extent the parents claim the visitation logs do not corroborate A.A.'s claims that the parents fight during visits, we note the court apparently agreed, finding: "The visits are going well."

The court instead based its order on the lack of "sufficient insight," in that "the behaviors which led to the Court's assumed jurisdiction are still happening." Monitored visitation aside, "when there's no oversight, the parent's behavior is troublesome. There is still violence between them"— even "third-persons, other unrelated people are aware of it and commenting on it. And this is recent." The record is replete with independent evidence of domestic violence amply supporting these findings, which do not turn on A.A.'s credibility.

---

[3] The parties debate the standard of review for prejudice. (Compare *In re Amy M., supra*, 232 Cal.App.3d at pp. 867–868 [harmless beyond all reasonable doubt] with *Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501, 1514–1515 [harmless by clear and convincing evidence].)

DISPOSITION

The parents' petitions for a writ of mandate are denied.


SCOTT, J.

WE CONCUR:


SANCHEZ, ACTING P. J.


DELANEY, J.