Filed 12/30/14  M.C. v. Superior Court CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| M.C.,<br><br>      Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>      Petitioner;<br><br>CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU,<br><br>      Real Party in Interest. | A143325<br><br>(Contra Costa County<br>Super. Ct. No. J13-00992, J13-00993) |

M.C. (Mother), the mother of M.Q. and A.Q. (collectively Minors or the children) petitions for extraordinary relief under California Rules of Court, rule 8.452, asking us to set aside the juvenile court's order setting a hearing pursuant to Welfare and Institutions Code[1] section 366.26.  We shall deny the petition on the merits.

## I.   BACKGROUND

### A. The Petition and Detention

The Contra Costa County Children & Family Services Bureau (the Department) filed petitions on August 28, 2013, alleging M.Q., then six years old, and his sister A.Q., then four years old, came within the jurisdiction of the juvenile court.[2]  (§ 300.)

---

[1] All statutory references are to the Welfare and Institutions Code.

[2] Minors' father (Father) is not a party to this writ proceeding.

According to the petitions, Minors were at risk of physical harm or illness because of Mother's serious and chronic substance abuse problem and because she had failed to provide safe and adequate housing. The petitions also alleged Mother had left the children with no provision for support and that she had abused each child's sibling by leaving the two children alone with no adult supervision and inadequate food.

According to the detention/jurisdiction report, in mid-August 2013, Minors were found wandering along a street alone. Police followed them home and found they had been left at home alone all day while Mother visited her boyfriend in another city. The children had left the house because M.C. had scraped his elbow when he was tripped by the family's pit bull puppy, and he wanted to find help and a Band-Aid. The home was filthy, with dog feces everywhere, and it did not have adequate food for the children. The carpets of the residence were stained with urine, there was old meat on the counter and dirty dishes in the sink, the bathroom sink was blocked, there were feces on the children's bedding and clothing, and the residence smelled foul and had a strong odor of urine. A clear plastic bag of marijuana was found on the nightstand of the master bedroom, within reach of the children. There were numerous open beer bottles throughout the home. It was a hot day, and the house had no functioning cooling system. The front windows were open and had damaged screens, and the back sliding door was unlocked. The children did not know how to reach Mother.

Mother's stepfather, Robert D., arrived at the home and told a police officer Mother had been neglecting Minors for some time, that she was hanging out with the "wrong crowd," and that she had not paid rent for four months.

Mother and a male companion came to the house in a car. Marijuana and rifle ammunition were found in the car. Mother reported she did not have a stable residence. She was arrested for child endangerment.

Mother told an officer she had prepared chicken for the children that morning and then left them alone while she drove to another city to see a friend. M.Q. told a social worker the children did not get enough food to eat, that Mother had left them at home by

themselves in the past, and that he had seen Mother "smoke this long brown thing that had dried up green stuff that looked like leaves in it."

Minors were detained and placed in the home of a relative on August 29, 2013.

## B. Jurisdiction and Disposition

According to an October 2013 disposition report, Mother said her family had been stable until she and Father separated.[3] After that, Mother reported, she "spiraled out of control," and her children suffered from her lack of attention.

The juvenile court sustained the allegations of the petitions on October 21, 2013, found that Minors' welfare required their physical custody to be removed from Mother, authorized the Department to place them in a relative's home, and ordered reunification services. Among other things, Mother's case plan required her to: keep the social worker informed of her address and telephone number; demonstrate the ability to maintain a clean, healthy, and safe home for six months; successfully complete a domestic violence counseling program and individual counseling; successfully participate in and complete an approved substance abuse treatment program and follow all after-care recommendations; participate in random drug and alcohol testing with negative results for six months, and with no-shows considered positive tests; and successfully participate in an AA/NA program one to three times a week and provide written proof of attendance.

According to update reports prepared by the Department in November 2013 and January 2014, Mother moved to the Sacramento area. Minors were living with their maternal grandmother (Grandmother) in Tracy. Mother had frequent telephone contact with Minors, and had a supervised visit in January 2014. As of January 24, 2014, Mother was enrolled in a substance abuse outpatient treatment program, and was planning to enroll in a 12-week domestic violence course. She would participate in drug testing through the outpatient program. Mother had been told the children should have no contact with Father.

---

[3] Father was deported in June 2013 after serving four months in jail for attempting to kill Mother and Minors.

## C. Six-Month Status Review

The Department prepared a report for the April 2014 six-month status review. Mother was "moving around Sacramento," while Minors lived in Tracy, and the Department reported that this arrangement had "not been conducive to working a Case Plan or having consistent visitation with the children." Mother had moved in with her grandmother (Great-Grandmother) in Big Oak Valley at the end of January 2014, and she had enrolled in an outpatient group in Nevada City that would provide drug testing. Because of transportation problems, Mother could attend outpatient programming only twice a week. She was dropped from the program after attending two sessions.

After attending a hearing on her child endangerment charges in March 2014, Mother went to Grandmother's house to collect money Grandmother was going to give her to help pay her bond. She arrived as Minors were getting ready for bed. She saw the children briefly but did not put them to bed or read to them.

Mother had borrowed Great-Grandmother's car for the trip and had someone drive her. When she failed to return the car, Great-Grandmother filed a stolen car report. A sheriff called Mother's number and a male answered and said Mother had told him the car belonged to her. When Great-Grandmother picked up the car, she reported that Mother had "keyed" the car with a large "MC" carved into the paint, there was a burn in the front upholstery, the back seat was damaged, and the interior of the car reeked of marijuana. Mother had charged $441 on Great-Grandmother's gas card. Great-Grandmother said Mother was no longer welcome to live with her.

Thereafter, Mother stayed with her stepmother in Sacramento, and entered a residential treatment program in March 2014. She had agreed to take parenting classes and had signed up for a domestic violence treatment program.

The Department reported that it had been difficult to arrange visitation between Mother and the children because of Mother's changes in residence and lack of access to transportation. Mother had not taken advantage of the Department's offers of tickets for public transportation. Minors had had several visits with Mother. Mother had frequent telephone conversations with Minors, but the conversations had to be monitored because

4

Mother had arranged for three-way conversations that included Father, against the Department's instructions.

At the April 2014 six-month review hearing, the juvenile court continued Minors as dependent children, found that Mother had contacted and visited Minors regularly and made significant progress in resolving the problems that had led to the removal, found there was a probability Minors could be returned to her physical custody by October 2014, and continued reunification services.

### D. May 2014 Interim Report

In May 2014, the Department reported to the court that Mother had entered the Gateway residential treatment program in Sacramento in March 2014, but had failed to complete her drug testing. She left the program and came to Martinez to enter the Ujima residential treatment program in April 2014. She arrived at the program, but left at 11:30 the same evening, saying she could not complete the program. Mother spoke to a social worker the next day to ask for tickets for public transportation, but did not tell the social worker she had left Ujima.

Mother entered the Wollam House residential treatment program in Antioch in late April 2014, but within a few weeks was indicating she did not want to stay at the program. Mother was pregnant with her third child. She was released from the program in early May 2014 because complications with her pregnancy prevented her from participating fully. Mother did not continue with her drug testing after she left the program. Mother said she was staying with a cousin in Concord, but did not give the Department the address. She had a supervised visit with Minors in May 2014, which was uneventful.

On two occasions, problems developed in connection with visitation. In April 2014, Grandmother dropped Minors off at Gateway House for a supervised visit; when she returned to pick them up, Mother called and told her Minors were at her stepmother's house. M.Q. told the social worker the stepmother had driven them there; according to the social worker, the stepmother had no valid driver's license or automobile insurance. In May 2014, Mother tried to visit with Minors at Wollam House, but she was not

allowed to do so because no arrangements had been made for a supervised visit. She called the social worker the next day and swore at her.

### E. Twelve-Month Status Review

A contested 12-month status review took place on October 9, 2014. The Department had recommended that the juvenile court terminate Mother's family reunification services and set a hearing pursuant to section 366.26.

According to the Department's status review report, Mother was currently residing at the Wollam House inpatient treatment program, which she had entered on August 5, 2014, after she gave birth to her third child. The director of Wollam House had reported that Mother was doing very well in the program. Before entering the Wollam program, Mother was living in a family shelter and attending an outpatient treatment program. She was "fully engaged" in the outpatient program and had no unexcused absences. She had missed six drug tests between April and July 2014, but the other tests she took were negative for drugs and alcohol. Mother had been participating in weekly supervised visitation with Minors.

Mother had participated in three sessions of a domestic violence support group. This participation was inadequate to meet the requirement of her case plan that she successfully complete a domestic violence counseling program. She had documentation showing she had attended three 12-step meetings in July 2014; this was inadequate to meet the requirement that she attend at least one meeting a week from the outset of her services. Her case plan required her to successfully complete a parenting program, but Mother had not provided any documentation showing she had done so.

Mother said she had left the Gateway program in April 2014 because of funding problems, after successfully completing a 30-day treatment program. She said her previous social worker had said it would be better for her to return to Contra Costa County for drug testing purposes. Mother had agreed to continue residential treatment in the Bay Area, but had failed to remain in a program until recently, after the birth of her new baby.

6

In its report, the Department expressed concern about Mother's "inconsistent and sporadic behavior" and "lack of follow through and lack of engagement" in her reunification services. It also noted that Mother's criminal child endangerment case was still pending.

The social worker who had been assigned to the case since mid-July 2014, Catherine Gates, testified at the 12-month review hearing that the Department had been trying to arrange supervised visitation between Mother and Minors once a week. Gates had supervised one visit between Mother and Minors. Mother's behavior was appropriate, she was engaged with Minors, and Minors seemed happy to be with her. Gates had not been able to talk with anyone at two programs Mother had attended because Mother had not signed releases. The director of Wollam had told Gates that Mother was attentive to her new baby, she was participating in her groups, and she complied with the program's requirements. She had not missed drug tests at Wollam, and all her tests had been negative. The program included 12-step meetings. Mother had attended five domestic violence support group sessions.

The juvenile court found that Minors' return to Mother would create a substantial risk to their well-being, and concluded there was no substantial probability Minors could be returned to Mother by the 18-month date, February 14, 2015. In doing so, it concluded Mother had not substantially complied with her reunification plan, that she had not engaged in individual or domestic violence counseling in a timely fashion, and that she continued to engage in criminal conduct during the reunification period. The court set a hearing pursuant to section 366.26 (the .26 hearing) for February 2, 2015.

## II. DISCUSSION

Mother contends the juvenile court abused its discretion in setting the .26 hearing because there was substantial evidence that Minors could be returned to her custody by the time of the 18-month hearing.

At the 12-month hearing, the juvenile court must return a dependent child to the physical custody of the parent or legal guardian unless the court finds the return would create a substantial risk to the child's safety, protection or well-being. (§ 366.21, subd.

7

(f).)  If the child is not returned to the parent or guardian's custody, the court must do one of the following:  (1) continue the case for up to six months (to a date no later than 18 months from the date of removal) (§ 366.21, subds. (g)(1) & (2); (2) order a .26 hearing at which parental rights would be terminated or a guardianship or foster care would be established (§ 366.21, subd. (g)(4)); or (3) order that the child remain in long-term foster care (§ 366.21, subd. (g)(5)).

As relevant here, a juvenile court may continue the case until the 18-month date "only if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent or legal guardian and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent or legal guardian."[4]  (§ 366.21, subd. (g)(1).  In order to find a substantial probability that the child will be returned, the court must find all of the following:  "(A) That the parent or legal guardian has consistently and regularly contacted and visited with the child. [¶] (B)  That the parent or legal guardian has made significant progress in resolving problems that led to the child's removal from the home.  [¶] (C)  The parent or legal guardian has demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs."  (§ 366.21, subd. (g)(1).)  Moreover, in determining whether to extend reunification services, the juvenile court must consider "the special circumstances of . . . [a] parent or parents court-ordered to a residential substance abuse treatment program."  (§ 361.5, subd. (a)(3).)

Mother contends the juvenile court's order should be reversed because there was substantial evidence that would have supported a finding that Minors could be returned to her custody by the time of an 18-month hearing.  She points out that she had entered Wollam House in August 2014 and was scheduled to graduate in early November 2014, that she was doing well there and was drug-free, that her new baby was with her there, that she had been visiting regularly with Minors, and that the visits had gone well.  She

---

[4] Mother does not challenge the adequacy of the services provided to her.

also suggests that her delay in entering a treatment program was the result of complications in her most recent pregnancy.

The question before us, however, is whether the record supports the findings the juvenile court made, not whether it would have supported a contrary finding. (*In re Brian M.* (2000) 82 Cal.App.4th 1398, 1401–1402 & fn. 4; *In re N.S.* (2002) 97 Cal.App.4th 167, 172.) In considering the sufficiency of the evidence to support a finding, we "view the juvenile court record in the light most favorable to that court's order. [Citation.] We may not reweigh or express an independent judgment on the evidence, but must decide only whether sufficient evidence supports the findings of the juvenile court. [Citation.] Issues of fact and credibility are matters for the trial court alone; we may decide only ' " 'whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trier of fact.' [Citation.]" ' " (*In re Amy M.* (1991) 232 Cal.App.3d 849, 859–860.) In reviewing a lower court's exercise of its discretion, "[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

In making its ruling, the juvenile court rejected Mother's contention that she had substantially complied with her case plan during the reporting period: the court noted she had been "bouncing back and forth" between Sacramento and Contra Costa Counties, failed to stay in regular contact with her social worker, failed to provide contact information, left the Ujima program after she was admitted, failed to abide by the restrictions on visitation, missed a number of drug tests, and engaged in criminal conduct. Although she had been participating in reunification services since early August, she had not engaged in individual counseling or domestic violence counseling in a timely manner. The court concluded: "I cannot find that on the state of the record before the Court that there's a substantial probability that these two children could be returned to Mother by the 18-month date, February 14, 2015, given what little progress she's made and she's had an entire year to make that progress."

9

We cannot fault this finding. The record contains evidence that well into the dependency, Mother's living situation was unstable, she failed to remain in approved treatment programs, she did not comply with the requirements that she complete domestic violence meetings and parenting classes, her drug testing was inconsistent, she failed to comply with the Department's directions regarding visitation, and she engaged in criminal behavior. Moreover, her case plan required her to demonstrate her ability to maintain a clean, healthy, and safe home for the children for six months. Although Mother was doing well in a residential treatment program, nothing in the record indicates she had demonstrated any ability to maintain a proper home for Minors for six months outside of that setting or that she would be able to do so before the 18-month hearing.

Our recitation of this evidence is in no way intended to minimize the efforts Mother had recently made to participate in her case plan. However, based on the record before it, the juvenile court could reasonably conclude that Mother's progress was insufficient for it to find there was a substantial probability that within four months, Minors could be returned to her physical custody and safely maintained in her care, as required by section 366.21, subdivision (g)(1).

## III. DISPOSITION

The petition is denied on the merits. (§ 366.26, subd. (*l*)(1)(C); Cal. Rules of Court, rule 8.452(h); *In re Julie S.* (1996) 48 Cal.App.4th 988, 990–991.) The request for a stay of the February 2, 2015 hearing is denied. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

_____
Rivera, J.

We concur:


_____
Reardon, Acting P.J.


_____
Bolanos, J.*


* Judge of the Superior Court of the City and County of San Francisco, assigned by the Chief Justice pursuant to Article VI, section 6 of the California Constitution.

11