Filed 3/3/16  In re Jonas S. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re JONAS S., et al., Persons Coming Under the Juvenile Court Law. | B264569 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JENNIFER P.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK07888) |

APPEAL from a judgment and orders of the Superior Court of Los Angeles County, Julie Fox Blackshaw, Judge.  Affirmed.


Neale B. Gold for Defendant and Appellant.


Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Julia Roberson, Associate County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Mother Jennifer P. appeals the juvenile court's judgment finding jurisdiction over her son, one-year-old Jonas S., pursuant to Welfare and Institutions Code section[1] 300, subdivisions (b) and (j), and dispositional and removal orders. We affirm jurisdiction and the disposition orders because substantial evidence produced by the Department of Children and Family Services (DCFS) supports the court's finding that Jonas was at risk of substantial physical harm due to Mother's on-going mental health issues. We also conclude that the court did not abuse its discretion in ordering Mother to engage in additional parenting classes. Lastly, we conclude that Mother's appeal is moot as to Mother's contentions regarding the removal order and visitation orders.

## FACTS AND PROCEDURAL BACKGROUND

### 1. Prior History with DCFS

Mother has a long history of mental health problems, with diagnoses of depression, Narcissistic Personality Disorder, Histrionic Personality Disorder, and Bipolar Disorder dating back to her teenage years. She was hospitalized over six times since she was thirteen years old due to suicidal ideations and being a danger to herself and, on one occasion, a danger to others.

Mother has three older children: 12-year-old Ethan, 11-year-old Maddox, and nine-year-old S. Mother initially came to the attention of child welfare services in San Diego County at the end of 2006 and beginning of 2007, when she was in conflict with her then-husband, the father of Maddox and S. (Ethan's step-father). That conflict, which appears to have been based on allegations that the husband was physically abusive and adulterous, precipitated Mother's multiple incidents of suicidal ideation. Specifically, child welfare services received a referral alleging that Mother was hospitalized in San Francisco for suicidal ideation and because she had threatened to take a blow dryer and curling iron into the bathtub to electrocute herself. Mother admitted to child welfare services that she had been hospitalized for two days in March 2007 after getting into a

---

[1] All subsequent statutory references are to the Welfare and Institutions Code.

fight with her husband, but denied being presently suicidal or threatening to electrocute herself. At that point in time, Mother was living in San Diego with Ethan, and her husband remained in the Bay Area with Maddox and S.

In May 2007, child welfare services in San Diego County received another referral alleging that Mother had taken two Vicodin pills and said she was going to kill herself. A butcher knife was found near the door and a bottle of pills were found in the same room as Ethan when law enforcement arrived at Mother's home. Mother was taken to the hospital to be evaluated. Mother admitted that she had taken the two Vicodin pills and that she told her cousin that she wanted to commit suicide in an effort to get the maternal grandfather's attention so that he would help her move out of her apartment. In addition, around this time, Mother also threatened to stab her husband in his sleep. When police made contact with Mother in regards to this threat, she was completely irrational, would not follow directions, and had to be physically restrained.

The juvenile court detained and found jurisdiction over Ethan pursuant to section 300, subdivision (b), based on Mother's unresolved mental health issues and Mother's threat against her then-husband. The court ordered Mother to undergo a mental health assessment and complete mental health counseling and parenting classes. Mother avoided the evaluation, and resisted mental health services, asserting that she did not need assistance. Mother eventually submitted to the evaluation, which determined that Mother had both depressive disorder (NOS, in remission) and personality disorder (NOS, narcissistic and histrionic features present). Mother subsequently failed to reunify with Ethan due to her resistance to obtaining help for her mental health issues, and the maternal grandfather became Ethan's legal guardian in November 2008.

2.     **Mother's DCFS Case Involving Jonas**

Mother gave birth to Jonas in 2013; his father is unknown. Mother and Jonas came to the attention of DCFS on October 13, 2014, after Mother was involuntarily hospitalized under section 5150. Police had received a call from Mother's friend stating that Mother told the friend via Facebook that she planned to kill herself by ingesting pills. When contacted by law enforcement, Mother stated that she was upset because her

3

grandmother just passed away and admitted that she had thoughts of killing herself by taking pills. Mother also admitted that she had a history of mental health problems and that she had lost custody of her oldest son due to depression. Mother acknowledged previously being prescribed medications for depression but claimed she did not need them anymore. Medical personnel decided to place Mother on a section 5150 hold and Mother was hospitalized. Subsequently, Mother denied that she said she wanted to kill herself and insisted that it was all a misunderstanding.

On October 16, 2014, DCFS filed a section 300 petition with the juvenile court, seeking to detain Jonas from Mother due to her unresolved mental health issues and previous dependency case involving those same issues. That same day, the juvenile court detained Jonas from Mother and ordered monitored visitation for her.

During visitation, Mother was highly inappropriate and hostile toward the foster mother and social workers, saying things like " 'You're telling me to kiss your ass.' " Mother became irritated and irrational, often focusing on the social workers or foster parents rather than focusing on Jonas during the visits. It was difficult to calm Mother down during visitation and her hostility seemed to worsen as visits progressed. On one occasion, Mother tossed toys around the visitation room, and on another, she threw a cup near Jonas's head when upset. Mother also self-reported that she was not taking medication.

Mother was observed taking pictures of the foster parent's and the social worker's vehicles without permission. Mother attempted to videotape visits and surreptitiously record the foster mother dropping Jonas off at visits. Mother also accosted a man at the office where the visits took place, demanding to know if he was the foster mother's husband, and refused to stop harassing the man when he said he was not her husband. During one visit, Mother refused to leave the visitation office and tried to stare down the office director by standing in the office director's doorway and refusing to move. Mother told the foster mother that she did not want the foster mother to have contact with Jonas, and became upset at the foster mother for smiling at Jonas or for not smiling at him on other occasions. Mother repeatedly pressed the social worker to answer questions about

4

the dependency proceedings. Mother also threatened to make allegations of abuse against the foster mother and staff.

When interviewed by DCFS at her home, Mother asserted that the only reason she was admitted to the hospital on the section 5150 hold in October 2014 was for the hospital's financial gain. She claimed that her friend misunderstood her comments on Facebook and as a result, called law enforcement. Mother claimed that a psychological evaluation from 2012 showed that Mother was a fit parent. Mother blamed the maternal grandfather for her not regaining custody of Ethan, saying that he would have fought her in court. Mother explained that the maternal grandfather treated her poorly and was a negative influence on Ethan. Mother also spontaneously stated, "[w]ho asked for a blonde baby?" and "[y]ou just want to keep my baby." Mother asserted that "[y]ou can't force me to take medication." During the home visit, Mother would not disclose her roommate's identity, and denied that exposed wires on the floor posed a danger to Jonas.

Shortly after Jonas was detained, Mother enrolled in parenting classes and therapy. Mother provided DCFS with a letter from her therapist attesting to Mother's therapy sessions for treatment of her adjustment disorder with mixed anxiety and depression. The therapist stated that she had not witnessed any psychosis or violent behavior and that Mother had not made any threats to harm herself and others. DCFS nonetheless was unable to verify the contents of the letter because when contacted, the therapist said that Mother had not provided permission for her to talk with DCFS about Mother. DCFS also received a letter from a mental health center reflecting that Mother had started services there and had met with a psychiatrist and case manager.

3.    **Juvenile Court Jurisdictional Findings**

In January 2015, the juvenile court held the jurisdiction hearing, receiving into evidence DCFS reports, a Multidisciplinary Assessment Team Summary of Findings Report for Jonas stating that he was doing well in his current placement, and a letter from the maternal grandfather stating that he did not believe Mother was suicidal or that she placed Jonas at risk in October 2014. The court also heard testimony from Mother's friend stating that he went to the hospital on the evening Mother was involuntarily

5

hospitalized and stated that although Mother seemed depressed, she never said she wanted to commit suicide and he had no concerns about her ability to take care of Jonas.

Mother's counsel asked the court to dismiss the petition, maintaining that Mother was never a danger to herself or others during the incident in October and asserting that Mother was addressing her past mental health issues by being proactively engaged in services. Jonas's counsel asked the court to sustain the petition, emphasizing that the evidence showed past and present mental health issues, Mother's unwillingness to take medication, and hostile, antagonistic behavior during visits indicative of continuing mental health concerns. DCFS similarly requested the court to sustain the petition, noting Mother's defensive behavior and her previous assertion at the detention hearing that she was not taking and would not take psychotropic medication.

The court sustained jurisdiction under both section 300, subdivision (b) and (j) counts, which stated:

> "b-1
> The Child [Jonas's] Mother . . . has a history of mental and emotional problems, including Depression and Suicidal Ideation, which renders [M]other incapable of providing regular care and supervision of the child. On 10/11/2014, [M]other was involuntarily hospitalized for the evaluation and treatment of [M]other's psychiatric condition. On prior occasions, [M]other failed to take [M]other's psychotropic medication as prescribed. The child's sibling Ethan . . . received permanent placement services due to [M]other's mental and emotional problems. [M]other's mental and emotional condition endangers the child's physical health and safety and places the child at risk of physical harm and damage."

> "j-1
> The Child [Jonas's] Mother . . . has a history of mental and emotional problems, including Depression and Suicidal Ideation, which renders [M]other incapable of providing regular care and supervision of the child. On 10/11/2014, [M]other was involuntarily hospitalized for the evaluation and treatment of [M]other's psychiatric condition. On prior occasions, [M]other failed to take [M]other's psychotropic medication as prescribed. [M]other has dependency court history in Kern County wherein the court sustained counts concerning the child's half sibling, due to [M]other's mental and emotional problems, including suicidal ideation. [M]other failed to comply with reunification services were terminated [sic]. The

6

child's sibling Ethan . . . received permanent placement services due to [M]other's mental and emotional problems. [M]other's mental and emotional condition endangers the child's physical health and safety and places the child at risk of physical harm and damage."

In finding jurisdiction, the court reasoned: "I sense a complete denial on [M]other's part that there even are mental health issues to be addressed. And until there is a recognition that there is a problem and an effort by [her] to address those problems, I do find there is a continuing danger to [Jonas]."

## 4. Post-Jurisdiction Events

Following the court's finding of jurisdiction, Mother underwent a court-ordered psychological evaluation pursuant to Evidence Code section 730. Psychologist Dr. Ronette Goodwin evaluated Mother in January 2015, and reviewed the child welfare reports in Ethan's and Jonas's cases, the 2012 psychological evaluation of Mother, and other documents related to the case. During the evaluation, Mother acknowledged losing custody of Ethan due to her mental health issues, but represented that she completed all aspects of her case plan except taking mediation. Mother acknowledged a history of mental health concerns starting in adolescence and indicated that she was prescribed various medications for her significant depression. Mother stated that following her last section 5150 hold in October, she was prescribed Zoloft upon discharge but refused to take the medication because she stated she would follow-up with an outside therapist. Mother told Dr. Goodwin that she was concerned that the psychiatric evaluation would be used against her.

Dr. Goodwin observed that Mother's mood fluctuated and that Mother became easily frustrated when discussing her child welfare history and angry when addressing her relationships with men. Mother frequently stated her rights were being violated and questioned the actions of DCFS and the mental health agencies. Dr. Goodwin diagnosed Mother with major depressive disorder, noting that her depressive symptoms were often triggered by situational factors such as financial and relationship strains, death, and child birth, and were exacerbated by her limited coping skills. Mother also presented with

7

features of narcissistic personality disorder, exhibiting difficulty in interpersonal relationships. Recognizing Mother's hesitance to take medication and that therapy was necessary to provide her with the coping skills she lacked, Dr. Goodwin stated that a combination of medication and therapy would stabilize Mother's mood and protect her against external stressors.

Acknowledging that she did not observe Mother with Jonas, Dr. Goodwin assessed that it did not appear that Mother would be a danger to Jonas if left alone with him. Dr. Goodwin noted that Mother "could potentially however place her son at risk if she neglects her self-care or mental health concerns." Dr. Goodwin identified Jonas's return to Mother as a "long-term goal" if Mother were compliant with treatment recommendations.

During visits following jurisdiction, social workers found working with Mother to be difficult. Mother failed to follow directions well, appeared to record visits, and in one instance, refused to stop taking pictures of a scratch mark on Jonas when told to desist. On another occasion, Mother disregarded a social worker's warning that Jonas was too little to sit in the children's chair in the visitation room, and Jonas fell out of the chair and bit his lip. Later, during a visit that occurred at a public library, Mother arrived late because she got lost, and acted frustrated and upset for the duration of the visit. When the social worker tried to have Mother and Jonas relocate to the library's toddler area, Mother became confrontational and refused. Mother then fell to the ground, grabbed her keys, and stated "I can't do this. I will see you another time." Mother eventually took Jonas to the toddler area, but she required repeated reminders that she should focus on Jonas rather than on the social worker. When a librarian approached, Mother stated, "I am a child abuser, and that's why I have to have someone watching me with my son." During this particular visit, Mother vacillated between sadness and anger, and insisted on discussing the court case even though she had signed a visitation agreement reflecting that she would not discuss the dependency matter during her visits. Mother told the social worker that she had signed the visitation agreement under duress.

8

In an April 2015 visit shortly before the disposition hearing, Mother had difficulty consoling Jonas, who eventually cried himself to sleep. Mother then woke Jonas up after he fell asleep because she felt the visitation was her time and that Jonas should be engaging with her. Throughout the visit, Jonas would repeatedly cry himself to sleep and Mother would wake him.

In addition, Mother began insisting that the social workers only contact Mother via email to address visitation, and told the social worker and her supervisor that contact via telephone or text message was "harassment." Mother also claimed she would seek a restraining order against the social workers monitoring the visits if they attempted to contact her by another method than email. In addition, DCFS had difficulty obtaining information from Mother's service providers. While Mother provided DCFS with information about her service providers, she refused to sign an authorization allowing DCFS to contact them. Instead, she represented to DCFS that she had told the service providers they could disclose to DCFS her dates of service but nothing else.

## 5. Disposition Hearing

In April 2015, the court held the dispositional hearing, receiving DCFS' reports and 730 evaluation into evidence, as well as exhibits from Mother showing her involvement in parenting classes, mental health evaluation, and mental health services. The court also heard testimony from Mother and Mother's friend Jimmy S., who monitored several visits for Mother and described the visitation as relaxed and fun. Mother testified that she did not feel like hurting herself or others. Mother also attested to completing a parenting class, being enrolled in therapy, and taking medication for anxiety when needed. When cross-examined on the medication issue, Mother was unable to approximate the number of anxiety pills she took regularly, insisting that she took them only as needed. Mother assured the court that she now had an emergency list of people for when she encountered mental health issues. Mother blamed the child welfare agency for losing custody of Ethan and the stress of her abusive marriage, saying that she felt that she could have done more but she did not feel like she had the support of the child welfare agency. Mother also thought that her past was being "held over [her]

9

head," and that the agency did not take seriously her ex-husband's alleged abuse of her, instead enabling him.

In closing, Mother argued for Jonas's return to her custody or unmonitored visitation based on the positive statements in the section 730 evaluation. Jonas's counsel advocated for removal and issuance of reunification services. Jonas's counsel had concerns that Mother posed a risk to Jonas based on Mother's failure to acknowledge her current mental health issues, Mother's bizarre behavior during visitation showing that these mental health problems persisted, and Mother's inability to discuss how often she took anxiety medication. DCFS asked the court to bypass reunification services altogether because of Mother's history with Ethan and failure to make sufficient progress in services already afforded to her.

Following argument, the court ordered Jonas removed from Mother's custody and ordered reunification services. The court found that Mother had not fully addressed her mental health issues and noted that Mother was extremely unforthcoming when asked questions regarding her mental health status. The court concluded that Mother needed to accept responsibility for her mental health issues in order for the court to safely return Jonas to Mother's home. The court found that Mother was "still trying to minimize, still not trying to fully admit" her mental problems. The court further found that Mother's erratic, unstable, and at times hostile behavior evidenced Mother's continuing unaddressed mental health issues. The court was particularly troubled by the last minute update it received regarding Jonas crying the entire visit and Mother waking him up from naps. The court stated that it was "troubled by the very basic things about childcare that [Mother was] not displaying in [her] visits." The court felt that Mother still had parenting issues to address despite her previous participation in a parenting class.

The court ordered Mother to complete hands-on parenting course, a psychological assessment, a psychiatric evaluation, individual counseling, and to take all prescribed psychotropic medication. The court also ordered monitored visitation for Mother, with DCFS having discretion to liberalize visits.

10

**6.      Jonas Returned to Mother's Custody**

Subsequently, in October 2015, the juvenile court granted Mother unmonitored day visits with Jonas at least three times a week or three hours per visit, as well as overnight weekend visitation with him.  On December 16, 2015, the juvenile court ordered Jonas to be placed with Mother, under the supervision of DCFS and terminated the April 3, 2015 suitable placement order.

## DISCUSSION

Mother appeals arguing that the court erred in finding jurisdiction over Jonas pursuant to section 300, subdivisions (b) and (j), by ordering her to engage in parenting classes, by ordering monitored visitation, and by removing Jonas from Mother's custody.

**1.      The Jurisdictional Findings Were Supported by Substantial Evidence**

When a section 300 petition alleges multiple subdivisions, " 'a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)  Here, the juvenile court sustained jurisdiction under both subdivisions (b) and (j).  Notably, the factual basis was the same for both sustained counts:  Mother's unresolved present and historical mental health and emotional issues.  We proceed with our jurisdictional analysis under subdivision (b).

A jurisdictional finding under section 300, subdivision (b) requires "three elements:  (1) neglectful conduct by the parent in one of the specified forms [in subdivision (b), such as a parent's failure to adequately supervise or protect a minor]; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)  We review the juvenile court's jurisdictional findings for substantial evidence. (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 966.)  "Substantial evidence is relevant evidence which adequately supports a conclusion; it is evidence which is reasonable in nature, credible and of solid value." (*In re R.C.* (2012) 210 Cal.App.4th 930, 941.)  Although substantial evidence may

11

consist of inferences, the inferences " 'must be "a product of logic and reason" and "must rest on the evidence" [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citations].' " (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393-1394, italics omitted.) Conflicts in the evidence and reasonable inferences are resolved in favor of the prevailing party. (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.) "[I]ssues of fact and credibility are questions for the trier of fact." (*Ibid.*)

Here, there was substantial evidence that Mother had a long history of mental health issues and suicidal ideation dating back to her teenage years. Mother's serious depression and personality disorders resulted in Mother losing custody of Ethan. In that case, Mother expressed that she intended to kill herself with Ethan in her custody. Mother failed to gain back custody of Ethan because she refused to engage in mental health services or take psychotropic medication.

Less than a year after giving birth to Jonas, Mother again said she wanted to kill herself, this time while caring for Jonas, and was involuntarily hospitalized after evaluation by doctors, nurses, and social workers. Throughout the time leading up to the jurisdiction hearing, Mother continued to minimize her mental health issues and stated she did not need medication. Mother consistently blamed and accused other people of being the cause of her problems, refusing to recognize the destructive role her unresolved mental issues played in her life.

Law enforcement found one-year-old Jonas in Mother's care on the day that Mother expressed her intent to kill herself. Given Jonas's young age and complete dependency on Mother, Mother's suicidal ideations placed Jonas in a particularly dangerous situation. Mother failed to fully address these mental health issues prior to the court obtaining jurisdiction. Thus, at the time of the jurisdiction hearing, substantial evidence supported the court's conclusion that Mother's unaddressed mental health and emotional problems placed one-year-old Jonas at serious risk of substantial harm. The court did not err in finding jurisdiction over Jonas.

Moreover, evidence that Mother was participating in counseling and parenting classes at the time of the jurisdiction hearing did not undermine the court's conclusion that she continued to pose a risk to Jonas. Although DCFS received letters stating that Mother was engaged in services, Mother refused to sign releases allowing her service providers to communicate with DCFS. Thus, DCFS was unable to obtain any substantive information regarding Mother's progress with these services. Furthermore, despite Mother's participating in services, Mother's mental health issues continued to manifest in her hostile, aggressive, and inappropriate behavior during visits with Jonas.

To the extent Mother asserts that Jonas was not at risk of harm while within her care based on statements from the maternal grandfather, her cousin, and her friend, Mother is essentially asking us to reweigh the evidence and to substitute her judgment for that of the trial court. We may not reweigh or express an independent judgment on the evidence. (*In re Laura F.* (1983) 33 Cal.3d 826, 833.) In this regard, issues of fact and credibility are matters for the dependency court alone. (*In re Amy M.* (1991) 232 Cal.App.3d 849, 859-860.) As stated above, substantial evidence supports the juvenile court's ruling as to jurisdiction.

For the foregoing reasons, we affirm the court's judgment finding jurisdiction over Jonas.

## 2. The Court Did Not Abuse Its Discretion in Ordering Mother to Take Further Parenting Courses

Mother argues that the court erred by "mechanically" ordering her to take parenting courses as part of the dispositional order. We review the juvenile court's dispositional orders for an abuse of discretion. (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 652.) " 'The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion. [Citations.]' " (*In re Corrine W.* (2009) 45 Cal.4th 522, 532; § 362, subd. (a) ["If a child is adjudged a dependent child of the court on the ground that the child is a person described by Section 300, the court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child."].) We

13

review for substantial evidence the findings of fact on which dispositional orders are based. (*In re Jasmin C.* (2003) 106 Cal.App.4th 177, 180.)

Here, evidence presented at the disposition hearing indicated that Mother's parenting skills were lacking despite her previous involvement in parenting classes. During the monitored visitation, Mother threw toys and a cup. Rather than focus on her child during her allotted time, she focused on the social workers. During one of the visits shortly before the hearing, Mother repeatedly woke Jonas up from his sleep and caused him to cry because she thought that Jonas should be interacting with her rather than sleeping during the visit. Mother's behavior indicates that she is not focused on her child's needs; rather, Mother has allowed her mercurial moods to dictate her behavior. The court's finding that Mother required additional instruction on parenting was thus supported by substantial evidence.

We therefore affirm the court's dispositional order requiring Mother to engage in parenting classes as the order was not an abuse of discretion.

### 3.     Mother's Appeal as to the Removal Order and Visitation Order is Moot

Mother appealed both the court's dispositional order requiring Mother to have monitored visitation as well as the court's order removing Jonas from Mother's custody. DCFS requested this Court take judicial notice of the juvenile court's October 14, 2015 order providing Mother with unmonitored visitation and its December 16, 2015 minute order stating that Jonas was to be placed in Mother's home. Pursuant to Code of Civil Procedure section 909 and Evidence Code section 459, we have taken judicial notice of both orders. DCFS argued in its brief that the appeal as to the monitored visitation was mooted by the subsequent court orders. DCFS also moved to dismiss part of Mother's appeal challenging the juvenile court's April 3, 2015 removal order on the ground that Mother's challenge to has been rendered moot by the December 16, 2015 order.

" '[A]n action that originally was based on a justiciable controversy cannot be maintained on appeal if all the questions have become moot by subsequent acts or events. A reversal in such a case would be without practical effect, and the appeal will therefore be dismissed.' [Citation.]" (*In re Dani R.* (2001) 89 Cal.App.4th 402, 404.)  Here, Jonas has been returned to Mother.  Thus a reversal of the removal and visitation orders will have no "practical, tangible impact on the parties' conduct or legal status." (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1490.)  As such, these two aspects of the appeal appear moot and should be dismissed, unless Mother would be subsequently prejudiced by the alleged errors. (*Ibid.* ["When the court cannot grant effective relief to the parties to an appeal, the appeal must be dismissed." (Italics omitted.)]; *In re Dylan T.* (1998) 65 Cal.App.4th 765, 769 ["An issue is not moot if the purported error infects the outcome of subsequent proceedings."].)

Mother concedes that the visitation order issue has been mooted.  Nonetheless, Mother contests that the removal order has not been mooted because "the jurisdictional facts might be disclosed by a social worker in a future petition, might be disclosed in other forums, and will be used against Jennifer in any future dealings with the Department."  Yet, Mother fails to identify any specific potential legal or practical consequence from the court's removal order.  In sum, Mother asserts that there is a "specter of a future impact." (*In re I.A.*, *supra*, 201 Cal.App.4th at p. 1494.)  Such highly speculative future impact is insufficient to show that the issue has not been mooted. (*Ibid.*)

We therefore conclude that the removal and visitation orders have been mooted and we do not address them in this appeal.

## DISPOSITION

The juvenile court's judgment and orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

JONES, J. [*]

We concur:

ALDRICH, Acting P. J.

LAVIN, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.