Filed 8/20/21  In re Z.E. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| In re Z.E., a Person Coming Under the Juvenile Court Law. | B309527 (Los Angeles County Super. Ct. No. 17CCJP02569A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. R.E., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jean M. Nelson, Judge.  Affirmed.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Aileen Wong, Senior Deputy County Counsel for Plaintiff and Respondent.

This juvenile dependency case is before us for a second time. In an earlier appeal, we affirmed the juvenile court's orders adjudging then four-year-old Z.E. (daughter) a dependent of the court and removing her from the custody of R.E. (father). We concluded sufficient evidence supported the court's finding that father sexually abused daughter (Welf. & Inst. Code,[1] § 300, subd. (d)). Daughter's mother H.L. (mother) was deceased. (*In re Z.E.* (Sept. 27, 2019, B292757) [nonpub. opn.].)

This latest appeal stems from the juvenile court's termination of father's parental rights over now seven-year-old daughter. Father does not challenge the sufficiency of the evidence underlying the court's finding that daughter was adoptable or that the parental-benefit exception was inapplicable. Instead, father argues the court erred in concluding the parental-benefit exception did not apply without holding a contested hearing at which daughter would testify. We affirm.

## BACKGROUND

### 1.    Events Leading To Earlier Appeal

Daughter was born in April 2014. Approximately 1:00 a.m. on December 14, 2017, mother died after she jumped, fell, or was pushed from the top of a six-story parking garage. Father and

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

daughter were present at the time.  Father was arrested on suspicion of murder.  By the time of the jurisdiction/disposition hearing, father was no longer in custody, but he remained a person of interest in mother's death.

In August 2018, the juvenile court sustained four counts of an amended dependency petition filed by the Los Angeles County Department of Children and Family Services (Department). Those counts alleged father had engaged in domestic violence with mother and former wives (§ 300, subd. (b)(2)); father suffered from bipolar disorder and anxiety, which he had failed to address adequately (§ 300, subd. (b)); father had emotionally abused daughter (§ 300, subd. (c)); and father had sexually abused daughter (§ 300, subd. (d)).  The court declared daughter, then four-years-old, a dependent of the court.

Following adjudication, daughter, who had been detained from father since the filing of the amended petition, remained placed with Maria, one of father's former wives, and her husband. Two of daughter's half siblings also resided with them.  Father's reunification plan required him to participate in counseling sessions to address grief, appropriate child discipline, domestic violence, appropriate boundaries with children, sex abuse/inappropriate sex behavior and conduct with children. Father was also ordered to undergo a psychiatric evaluation.  He was granted monitored visitation.

The court also confirmed an earlier order limiting father's rights to make educational and developmental service decisions for daughter based upon his refusal to allow her to benefit from those services and to the provide necessary information for her daycare enrollment.  (§ 361, subd. (a).)  Those rights were transferred to Maria and her husband.

3

## 2. Earlier Appeal

In an unpublished opinion, we held substantial evidence supported the finding of father's sexual abuse of daughter under section 300, subdivision (d). (*In re Z.E., supra,* B292757.) That evidence included: "Daughter's therapist reported daughter's conduct and statements were not typical for a child her age. According to both the therapist and Maria, daughter exhibited over-sexualized behaviors. For example, daughter asked whether Maria's husband kissed Maria on her 'pec pec' or vagina, indicated 'daddy' said those types of things, spoke of father kissing her on her butt, drew a picture of father's penis, played with an imaginary friend who did not like it when her imaginary father kissed her butt and vagina, drew pictures of people and said, 'This is kissing vagina.' Daughter also expressed distress at answering questions about father and revealed she did not want father to know she was happy in Maria's home because he would get mad. Additionally, as daughter spent more time in Maria's care, she and her imaginary friend no longer told sexualized stories. Daughter and her imaginary friend were both happy living with Maria and her family and attending school. In addition to daughter's statements and actions, the juvenile court mentioned maternal grandmother's statement that father rubbed daughter from vagina to buttock as well as father's old handwritten journal containing pedophiliac ideations. In light of this record, we conclude substantial evidence supports the juvenile court's exercise of dependency jurisdiction under subdivision (d)." (*In re Z.E., supra,* B292757.)

## 3. Reunification Progress

The dependency proceedings in this case lasted over three years due in part to unexpected pandemic delays. The juvenile

4

court held an extended six-month review hearing and a 12-month hearing to monitor the reunification process. Both hearings were contested. In the meantime, daughter remained placed with Maria and her husband, where she was comfortable and adjusting well. The couple wanted to adopt daughter should father's reunification efforts prove unsuccessful.

During the reunification process, father remained steadfast in his desire to regain custody of daughter. Although his request for unmonitored visitation was denied, father consistently engaged in twice-weekly monitored visitation at a park without incident. The two of them made drawings, read books, and played on the swing set together. Daughter enjoyed her visits with father, whom she called exclusively by his full name. However, she repeatedly expressed her desire to live with Maria and Maria's husband and still visit father. Daughter stated she did not want to live with father. At school, daughter gained more self-confidence "both academically and socially." She always looked forward to attending school.

By the extended six-month review hearing on April 30, 2019, father had completed 20 parent education group counseling sessions and 15 sessions of individual therapy. At the conclusion of the hearing, the juvenile court found father had partially complied with the reunification plan and ordered additional individual therapy sessions.[2]

In June 2019, daughter, now five years old, appeared uncomfortable talking about father. During this time, she reverted to displaying over-sexualized behavior, including

---

[2] There is no reporter's transcript of these proceedings in the record on appeal.

touching the clothed breasts of her therapist and her half sister's friends. In August 2019, daughter told a Department social worker that she wanted to live with Maria "forever," but that father, whom she still called by his full name, said, "No," and was "angry."

That same month, the Department asked father about his plans for daughter's continued schooling and therapy if he were to regain custody. Father stated school was not compulsory for children before the age of seven years and he planned to home school daughter. Father also intended to wait until daughter had "decompressed" prior to enrolling her in school or continuing her therapy.

The contested 12-month review hearing occurred on October 16, 2019. Two witnesses, a Department social worker and father's therapist, testified on behalf of father. No witnesses were called by the Department.

At the conclusion of the hearing, the juvenile court terminated father's family reunification services, finding father was not in substantial compliance with his reunification plan because he continued to deny having sexually abused daughter. The court observed that father's interactions with the Department and his therapist consistently demonstrated father's feeling that "he is the victim here." The court added that in refusing to acknowledge his misconduct, father "simply believes he does not need to change anything about him or how he raises his child." The court ordered a permanent plan of adoption for daughter.

4. **Post-reunification Period**

From January through October 2020, daughter made clear her waning interest in having contact with father. In January

6

2020, daughter told Maria she did not want to live with father and had nightmares about going back to him. Daughter told a social worker she would have no friends and no school if she went to live with father. All she would do is play with him. Daughter said she enjoyed father's visits, but she did not want to live with him.

In-person monitored visits changed to "Zoom" visits in July 2020 and decreased in regularity. On August 14, 2020, daughter said she disliked Zoom visits with father because they were "boring." Daughter preferred the park visits, but she wanted to go there with Maria and not see father anymore. Twelve days later, daughter again stated she wanted to go to the park with Maria ("mom") and Maria's husband ("dad") because father "smelled" and she did not miss him. When told father wanted to see her and their visits were court ordered, daughter replied, "well, duh, but I don't miss him."

During a monitored visit in September 2020, daughter displayed a disturbing lack of respect for father and seemed angry with him. Father appeared tired, increasingly frustrated with daughter, and disinterested in active play. After the visit, daughter characterized father as "mean" and said she no longer wished to see him for that reason.

In early October 2020, daughter began drawing pictures of mother and asking why she had died. After a monitored visit with father, daughter stated she believed father "did it" and "pushed [mother] because he is Evil!" Daughter added that father probably wanted "to live alone without [mother] and without me." Daughter stated if she found out father had pushed mother, she would "spank his butt for a long time."

For his part, Father exhibited some unusual behavior toward daughter during this period. Following a June 19, 2020 monitored visit, daughter asked Maria if mother was at the home of father (using his full name). Daughter said father had talked about mother, but she knew mother was dead. Daughter asked Maria why everyone thought father had killed mother.

During another visit on July 1, 2020, a monitor noticed father kept talking about needing to "go [to] the bank to transfer money [to] avoid [a] penalty," and to expect a "huge surprise" and "something big" the following week. When she left the visit, daughter commented that she would soon be seeing father every day. Daughter told the monitor she did not know what the surprise was or the reason for it.

At the Department's behest, on July 17, 2020, the juvenile court ordered that two monitors be present during father's visitation, and that father arrive after daughter and the monitors, and that he leave before the daughter and the monitors. Father was also ordered not to discuss with daughter "the petition allegations," "mother," or "returning home to father."

5.  **Exclusion of Daughter's Testimony and Termination of Parental Rights**

Daughter's counsel filed a motion to exclude now six-year-old daughter from testifying at the pending section 366.26 hearing. Counsel argued the issues to be resolved at the hearing would not be materially affected by daughter's testimony and the psychological harm to daughter from testifying would outweigh any potential benefit. In support of the motion, counsel submitted a report from daughter's therapist indicating daughter suffers from adjustment disorder. The therapist stated daughter

8

"appeared to have increased defiance, difficulties falling asleep, [and] lack of focus/disruptive behavior since the Covid-19 quarantine and irregular visitation with father." The therapist therefore recommended that daughter's involvement in the court proceedings be "reconsider[ed] or limit[ed]" to "reduce the risk of retraumatization."

In written opposition, father's counsel argued questioning of daughter would be limited to her relationship and visitation with father to establish the parental-benefit exception to the termination of parental rights. (§ 366.26, subd. (c)(1)(B)(i).) The focus would be the reason for daughter's negative view of father since July 17, 2020, when father's visitation was ordered to have two monitors. Counsel maintained father had a due process right to such testimony and measures could be taken to ensure daughter would suffer no psychological harm.

At the November 18, 2020 hearing, the juvenile court heard and granted the motion of daughter's counsel after considering an offer of proof made by father's counsel. (See Discussion, *post*.) Daughter would be excluded from testifying at the permanency planning hearing.

On December 7, 2020, the juvenile court convened the permanency planning hearing. No witnesses were called to testify. The court terminated parental rights, found by clear and convincing evidence that daughter was adoptable and that there were no legal impediments to adoption, and found adoption was in daughter's best interest. The court found the permanent plan of adoption was appropriate, ordered adoption as the permanent plan, and designated Maria and her husband as the prospective adoptive parents. Father filed a timely notice of appeal.

## DISCUSSION

Parental rights may be terminated only upon a finding the child is adoptable and no statutory exception to adoptability applies. (§ 366.26, subds. (b) & (c)(1).) Father does not attack the sufficiency of the evidence underlying the juvenile court's findings that daughter was adoptable or that the parental-benefit exception did not apply. Instead, father argues the juvenile court erred in terminating parental rights without a contested hearing at which daughter would testify in support of the parental-benefit exception.

### 1. Additional Background

Before ruling on the motion of daughter's counsel to exclude her testimony, the juvenile court requested an offer of proof from father's counsel in support of the application of the parental-benefit exception. The court asked counsel for "facts" not already reported from the period before daughter's view of father turned negative that would show her relationship with him was more than "just friendly visits between a parent and child." Father's counsel proffered daughter's testimony that father helped teach her to read, draw, and play, and that he brought daughter snacks, assisted her with "different projects" and "answer[ed her] questions regarding the world as she has grown."

In granting the motion to exclude daughter from testifying, the juvenile court ruled the offer of proof was insufficient. The court explained much of the proffered testimony would not significantly change what the Department had reported and was not probative as "compelling" evidence of the requisite "parental bond" for the parental benefit to apply. Citing *In re Jennifer J.* (1992) 8 Cal.App.4th 1080 (*Jennifer J.*), the court further found that forcing daughter to testify would be too traumatizing for her

10

based on her therapist's report, father's sexual abuse, and mother's death.

At the section 366.26 hearing, father's counsel asserted the exclusion of daughter as a witness "materially affected this hearing" and then argued the parental-benefit exception should apply. The court disagreed, stating father could not demonstrate the requisite parent-child bond. The court explained that daughter never referred to father as "father," but instead called Maria's husband "father." Additionally, the court found daughter had developed a "deep and loving" relationship with Maria and her husband, which had helped her overcome the trauma of her sexual abuse. The court, accordingly, terminated father's parental rights.

## 2. Offer of Proof and Parental-benefit Exception (*In re Caden C.* (2021) 11 Cal.5th 614)

A parent has a due process right to present evidence at a permanency planning hearing where parental rights are at stake. The due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court. (*In re Jeanette V.* (1998) 68 Cal.App.4th 811, 817.) The juvenile court may require a parent to make an offer of proof as to what evidence would be adduced at a contested hearing and why that evidence is "relevant . . . on the issue [the parent] seeks to contest." (*In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1122; *In re Earl L.* (2004) 121 Cal.App.4th 1050,1052–1053; *In re Grace P.* (2017) 8 Cal.App.5th 605, 612.) A contested hearing is not necessary if the proffered evidence will have no effect on that issue. (*In re Grace P.,* at p. 614.) We review the denial of a contested hearing for an abuse of discretion. (*In re Grace P.,* at p. 611.)

11

The issue here was whether the parental-benefit exception applied to preclude termination of father's parental rights. The elements of that exception have recently been clarified by the California Supreme Court in *In re Caden C.*, *supra*, 11 Cal.5th 614 (*Caden C.*), which was issued in the midst of briefing in this case. *Caden C.* specifies that under the parental-benefit exception, a parent "must show, by a preponderance of the evidence, three things. [First,] [t]he parent must show regular visitation and contact with the child . . . . [Second,] the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And [third,] the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*Caden C.,* at pp. 636–637.)

Even without the benefit of *Caden C.*, the juvenile court's analysis of both the quality of father's offer of proof for a contested hearing on the exception and the applicability of the parental-benefit exception here comport with the newly clarified elements of the exception as articulated in the recent Supreme Court opinion. Therefore, remand for the juvenile court to reconsider its rulings in light of *Caden C.* is unnecessary.

3.   **Juvenile Court Did Not Abuse Its Discretion in Refusing to Conduct a Contested Hearing**

In requesting a contested hearing, father's counsel made an offer of proof relating to the second element of the parental-

12

benefit exception—whether daughter had "a substantial, positive, emotional attachment to [father]—the kind of attachment implying that [daughter] would benefit from continuing the relationship."[3] (*Caden C., supra,* 11 Cal.5th at p. 636; see also *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) This element is influenced by numerous factors: "The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.,* at p. 576; accord, *Caden C.,* at p. 632.) Yet, the only factor suggested by father's offer of proof was that he and daughter had some positive interactions consisting of conversations and shared activities in a series of visits, which the Department had already reported. This clearly was not significantly probative of the requisite emotional attachment. To invoke the parental-benefit exception, a parent must do more than exhibit "frequent and loving contact" (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418) or that the parent and child mutually enjoy their visits (*In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324). "A biological parent . . . may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship

---

[3] It is undisputed that father satisfied the parental-benefit exception's first element, " 'regular visitation and contact.' " The Department reports documented father's visitation as consistent, without significant lapses, and occurred to the extent permitted by court orders and pandemic conditions. (See *In re I.R.* (2014) 226 Cal.App.4th 201, 212.)

maintained during periods of visitation with the parent. [Citation.] A child [, especially a young child,] . . . should not be deprived of an adoptive parent [where, as here,] the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)

Father claims his hands were tied by the juvenile court's order prohibiting him from "discussing case issues" with daughter. According to father, the court thus faulted him unreasonably for not proffering more "compelling" evidence, and his only option was to have daughter testify. The order to which father refers prohibited him from discussing with daughter "the petition allegations," "mother," or "returning home to father" following his erratic behavior on July 17, 2020. Whether the parental-benefit exception applies, however, does not hinge on the parent's having discussed the section 300 allegations with the victimized child. Indeed, the test is not what the child says about the parental abuse or neglect, but whether the child has a strong, significant, and positive relationship with the parent notwithstanding the parental abuse or neglect. (See *Caden C.*, *supra*, 11 Cal.5th at p. 633.) Father's offer of proof was insufficient to justify a contested hearing on the parental-benefit exception. The juvenile court's refusal to conduct one was not an abuse of discretion.

4.     **Father Could Not Carry His Burden to Prove the Parental-benefit Exception Applied**

More to the point, father could not establish the second element of the parental-benefit exception because he could not show daughter had a substantial, positive, emotional attachment to him such that she would benefit from continuing their

14

relationship. Daughter had become hostile toward father and anxious about having ongoing contact with him, which aggravated the symptoms of her adjustment disorder. Apart from a short period between the first and second detention hearings, daughter lived with Maria and her husband during the three-plus years of dependency proceedings, which, at the time, was more than half daughter's young life. Throughout these years, daughter called father only by his full name, while she began to call Maria "mom" and Maria's husband "dad." Daughter also was adamant that she remain with Maria and her husband and only visit father, until she ceased wanting to visit him at all. It is also uncontroverted that daughter's bond with Maria and her husband strengthened as daughter's deep-seated concerns about continued contact with father grew.

As for the third element, whether "termination would be 'detrimental to the child *due to*' the child's beneficial relationship," the issue is whether it would be harmful to the child to sever the relationship and choose adoption. (*Caden C., supra*, 11 Cal.5th at pp. 633–634.) We agree with the juvenile court. Far from suffering a detriment if her relationship with father were terminated, the record reveals daughter would not only gain a stable homelife, but she would also continue to make progress in overcoming the trauma of her sexual assault. (See *In re N.S.* (2020) 55 Cal.App.5th 816, 854.)

5. **Additional Issues**

Father raises two additional issues. He contends the juvenile court erred in refusing to allow daughter to testify, contrary to *In re Amy M.* (1991) 232 Cal.App.3d 849 (*Amy M.*), which held the parents' due process rights were violated when the juvenile court refused to allow the child to testify despite the

parents' request. (*Id*. at p. 867.) *Amy M.* noted that claiming the child's presence was "not necessary" was insufficient to meet the parents' due process rights; further, there was no adequate substitute for the child's testimony such as earlier testimony or reported statements and no showing was made the child was unavailable within the meaning of Evidence Code section 240. (*Amy M.*, at pp. 865–866.) We do not reach the issue of whether daughter's testimony was mandated by *Amy M.* because father failed to make the threshold showing that he was entitled to a contested hearing for daughter to testify.

In excluding daughter from testifying, the juvenile court relied on *Jennifer J., supra,* 8 Cal.App.4th 1080, which held that despite the lack of statutory or case law authority, a court has the power based on the overriding goal of protecting the child to carefully weigh whether the child's testimony would materially affect the issues to be resolved against the possible psychological harm to the child caused by testifying. (*Id*. at p. 1089.) Father argues the court's reliance on *Jennifer J.* was misplaced because it conflicts with controlling California Supreme Court precedent and Evidence Code section 240. Father forfeited this argument by failing to assert it in the juvenile court (*In re S.B.* (2004) 32 Cal.4th 1287, 1293; *In re Elijah V.* (2005) 127 Cal.App.4th 576, 582). For the same reasons discussed above, we decline to exercise our discretion to reach the merits of this claim despite the forfeiture.

16

## DISPOSITION

The juvenile court's order is affirmed.

**NOT TO BE PUBLISHED.**


                                        LUI, P.J.

We concur:



CHAVEZ, J.



HOFFSTADT, J.

17