Filed 9/25/24  In re V.K. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re V.K., et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>        Respondent,<br><br>            v.<br><br>E.R.,<br><br>        Appellant. | G063678<br><br>(Super. Ct. Nos. 23DP0761; 23DP0762)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Lindsey E. Martinez, Judge. Dismissed.

Jesse McGowan, under appointment by the Court of Appeal, for Appellant.

No appearance for Respondent.

\*     \*     \*

E.R. (Mother) appeals from the Orange County juvenile court's (the court) dismissal of a dependency petition alleging P.K. (Father) had abused their children, V.K. and M.K. (Minors). Mother's appointed counsel filed a letter brief stating he could not find any arguable issues to raise on Mother's behalf, but he requests we independently review the record under *In re Sade C.* (1996) 13 Cal.4th 952 (*Sade C.*). Appointed counsel identified two issues to assist in our independent review: (1) whether Mother has standing to challenge the order dismissing the petition; and (2) whether the evidence showed Minors were persons described by Welfare and Institutions Code section 300.[1] Mother's counsel also requests we exercise our discretion to permit Mother to personally file a supplemental brief. (*In re Phoenix H.* (2009) 47 Cal.4th 835 (*Phoenix H.*).)

At the outset, we deny Mother's request to personally file a supplemental brief. Mother has not submitted a proposed supplemental brief since the filing of her counsel's letter brief in April 2024, and a parent has no right to file his or her own brief "unless the parent can establish good cause by showing that an arguable issue does, in fact, exist." (*Phoenix H.*, *supra*, 27 Cal.4th at p. 845.) Although we are not required to do so, we have independently reviewed the record and have not found any arguable issues. We accordingly dismiss the appeal.[2]

---

[1] All further statutory references are to the Welfare and Institutions Code

[2] If an appellant does not establish any error, the appellate court may dismiss the appeal. (*Sade C.*, *supra*, 13 Cal.4th at p. 994.) Unlike criminal cases, we are not required to conduct an independent review of the record. (*Phoenix H.*, *supra*, 47 Cal.4th at pp. 841-843.)

## STATEMENT OF FACTS

### I.

### THE DEPENDENCY PETITION

In July 2023, Minors were taken into protective custody when V.K. was ten years old and M.K. was eight years old. A few days later, the Orange County Social Services Agency (SSA) filed a petition pursuant to section 300, subdivisions (a), (b)(1), and (c). The petition alleged, inter alia, that Father physically abused M.K. and that V.K. was at risk of physical abuse in Father's care. According to the petition, M.K. reported Father struck him multiple times, grabbed him by the face or neck, and yelled at him after he spilled milk in June 2023. He was later diagnosed with a concussion, which was allegedly caused by or exacerbated by Father's actions. M.K. reported Father threatened to kill his sister if he disclosed the incident to Mother. He also reported Father "'always'" hit him, dragged him through his own vomit, and called him derogatory terms.

V.K. reported witnessing the "spilled milk" incident in June 2023 and indicated Father had made "threatening gestures" to M.K. in the past. She also reported Father threatened to kill Mother's significant other if Mother discovered the physical abuse. Finally, she claimed Father read her messages with Mother and recorded her while questioning her about Mother. Minors both reported they did not want to return to Father's home.

The petition also alleged Father had unresolved mental health and anger management issues as well as substance abuse problems. Mother likewise had a history of mental health issues, and Mother and Father had a history of domestic violence.

## II.

### DETENTION

Prior to the detention hearing, SSA submitted a report noting Mother and Father shared joint custody of Minors, and Mother had married another man in 2020. Father was a Los Angeles County Sheriff "and works in the Courts" while Mother was a retired Los Angeles County Sheriff. Among other things, SSA's report repeated M.K.'s recollection of Father's abuse. In addition to the "spilled milk" incident, M.K. reported he vomited after eating sushi. Father allegedly threw sushi at him, dragged him in the vomit, and threw him in the shower with no lights on. M.K. also recalled Mother had told him Father broke into her home on one occasion. According to both Minors, Mother did not like Father, Father called Mother bad names, Father previously made a threatening comment about Mother's boyfriend, and Father was "mean."

The report further noted Minors denied any sexual abuse, but Mother told SSA she was concerned about sexual abuse because M.K. allegedly mentioned Father "inserted his fingers in . . . [his] anus when . . . [F]ather wiped him" and called him a "'Bitch'" when he complained of pain. Mother also claimed Father broke into her home in 2017.

Father presented a different story. According to SSA's report, Father denied any physical abuse or that he threatened to kill anyone. He said M.K. hit his head and scratched his nose at the pool. According to SSA's report, M.K. also previously said he had scraped his nose and forehead at the pool. Father did not take M.K. to a doctor because a relative who was a doctor and at the pool said it was not necessary. SSA asked about the incident when M.K. spilled milk, and Father suggested he was not bothered by it. Instead, he grabbed M.K. to prevent him from falling from his chair. Father was

4

adamant Minors were "being coached to speak" and that Mother "coerces [V.K.] to say things." He suggested he was "being framed as there is brainwashing going on" and because Mother had mental health issues. Father showed SSA text messages between Mother and V.K. referring to him and the paternal grandmother in what he believed was derogatory terms. Father also was concerned Minors were sexually abused and noted Mother's ex-boyfriend was a rapist. V.K. apparently told him Mother hit her and M.K. with a cane and Mother's husband[3] "walked around naked" and made her uncomfortable by staring at her.

SSA's report further noted Mother took M.K. to the hospital in June 2023. According to the hospital physician, M.K. said he jumped in the pool and hit his face on the bottom of the pool the day before the hospital visit. But Mother told the hospital Father had hit M.K. on the side of the head, grabbed his chin, and kicked him in the abdomen. The doctor concluded M.K.'s facial injuries were consistent with hitting the bottom of a pool, but he could not say what caused M.K.'s concussion.

Relying on SSA's detention report, Mother applied for a temporary restraining order. After a hearing, the court detained Minors from Father and ordered them to remain in Mother's care. The court also ordered Mother and Father to not discuss the case in front of Minors and to not disparage each other in front of Minors. The court further authorized supervised visitation for Father and denied Mother's request for a restraining order.

---

[3] It appears Father referred to Mother's "boyfriend," but based on the facts, we assume he was referring to Mother's husband.

SSA REPORTS PRIOR TO THE JURISDICTION HEARING

Before the jurisdiction hearing, SSA recommended the court sustain the petition and declare Minors to be dependents of the court.[4] SSA also recommended Minors remain in Mother's custody, Mother participate in services, and Father receive enhancement services.

SSA submitted numerous reports from August 2023 to January 2024. As of August 2023, SSA continued to have concerns about Father's physical abuse of M.K. and both parents' mental health because they expressed mental health concerns about each other. Mother had a history of post traumatic stress disorder, and Father previously messaged Mother he had a "'barrel'" down his mouth. SSA noted Mother and Father had limited insight into the effects of corporal punishment and unresolved mental health problems.

In August 2023, Mother told a social worker Minors were afraid of visits with Father. The social worker told Mother she was concerned about Mother's nonverbal communication with Minors and noted Mother always "wore an expression of deep worry" when Minors returned from visits. The social worker was worried this suggested Minors should be fearful of the visits. The same social worker told Minors all she "'saw was kindness'" in reference to a visit with Father.

During an August 2023 visit, Father was calm, attempted to engage Minors, asked questions about their school, complimented them, and

---

[4] During the jurisdiction hearing, SSA later changed its recommendation and requested the court dismiss the petition and terminate dependency because it did not have sufficient credible evidence to sustain the petition.

told them he loved them very much. Minors mostly ignored Father, refused to engage with him, made angry faces, and appeared to be scared.

As of September 2023, Minors' therapist reported Minors were "'extremely traumatized'" and genuinely afraid of Father. She did not believe V.K. was lying or coached. The therapist recommended visits with Father be discontinued or reduced.

By the end of September 2023, Minors were still not willing to engage with Father during visits. Father reported Mother was racist, had a "mental health history," faked an injury to no longer work in law enforcement, and had a "personal vendetta to hurt" him. He acknowledged he had made derogatory comments about Mother in the past because she was unfaithful to him.

In October 2023, Mother told SSA that Minors did not want to attend a visit with Father because they were scared. The visit was ultimately cancelled as Minors were having physical symptoms from their fear. Mother also generally reported Minors had behavioral challenges on visit days, including "gastric distress" from anxiety. She further told SSA Minors were in "a state of panic" and believed Father would hurt them. On another occasion, she reported V.K. had nightmares about Father coming to harm them.

By contrast, Father insisted Mother was "brainwashing" Minors and had significant mental health issues. He reminded SSA he had provided evidence Mother talked negatively about him to V.K. through her iPad in violation of the court's orders. He believed Mother was not genuinely worried about Minors' safety because she waited three days to call authorities regarding the alleged incident leading to the instant dependency case. He explained the text messages he had sent to Mother threatening to harm

himself were from when he was intoxicated after learning Mother had cheated on him. He did not believe this incident from nine years ago should be held against him as the family court had already reviewed the information and gave him joint custody of Minors. He further claimed Mother pointed and laughed at him when she was in her car at a prior visit. Finally, he was deeply hurt by Minors' unwillingness to interact with him and believed their behaviors were "highly uncharacteristic."

Around the same time, V.K. told SSA Father "scoffed" at them. When asked to clarify, she said Father "does heavy, frustrated sighing, rolls his eyes, and is 'exasperated' when" they refuse to engage with him in visits.

In November 2023, Mother told SSA that M.K. again told her Father "used to put his fingers into his 'butt'" and that it happened a lot. When M.K. complained, Father would call him a "little bitch" and twist his nipples. SSA followed up with M.K. who initially denied any touching of his private areas. But M.K. then stated Father "put his finger in . . . [his] . . . butt and twisted his nipples." When asked if this happened when Father was wiping his butt, M.K. said he did not recall details other than it occurred a few years ago. He denied any recent occurrences.

A few days later, Father sent several old text messages from Mother to SSA "to show she's not who she claims she is." In the messages, Mother used profanities and made several insults and aggressive comments to Father.

In the middle of November 2023, SSA reported it was "unclear why [Minors] [were] not settling peacefully into . . . [M]other's care when they have been apart from . . . [F]ather, who is allegedly their source of fear, since July 12, 2023." The report continued: "Between 7/12/23-10/4/23, [Minors] have seen . . . [F]ather 11 times, for one hour or less each visit, with monitors

8

closely supervising. There appears to be some trigger for their increased anxiety and paranoia but SSA is unclear as to what that may be, since . . . [Minors] have had such minimal exposure to . . . [F]ather for over 4 months."

At the end of November 2023, Father sent additional text messages he had received from Mother to SSA. The messages were from a few years prior. In one of the messages, it appears Mother said she locked V.K. in a room.

In December 2023, Father told SSA Minors were happy in his care prior to the pool incident, and he felt he was being framed. He also claimed Mother had sent text messages using derogatory terms to refer to him and the paternal grandmother. Father's therapist reported Father was motivated to repair his relationship with Minors, felt the charges against him were unfounded, and wanted visitation to resume.

Mother reported Minors continued to refuse visits with Father, were under significant stress, and V.K. had "intrusive thoughts about 'scary' scenarios involving . . . [F]ather." She added Minors had expressed they wanted to kill themselves and did not want to live anymore. Mother's therapist likewise told SSA that Mother had reported V.K. threatened suicide and was panicking about seeing Father. The therapist had no concerns about Mother.

V.K. told SSA she had nightmares about Father kidnapping them, fears going back to Father, and wanted to change her last name. M.K. told SSA he had nightmares about Father breaking into their home and worried about going back to Father's care.

9

# IV.

## JURISDICTION HEARING

At the jurisdiction hearing in January 2024, the court admitted SSA's reports into evidence and heard testimony from Minors, Mother, and the social workers.

### A. M.K.'s Testimony

M.K. testified he stopped visiting Father months ago because he was scared. He claimed Father hit him and called him a "bitch." When asked when Father hit him, M.K. specifically said five years ago when he was around four years old. He added that Father called him a "bitch" three years ago. M.K. noted he vomited after Father gave him sushi one time. Father then hit him and dragged him in the vomit. M.K. claimed the incident occurred four years ago when he was five years old. He further testified about the alleged incident when Father hit him for spilling milk and acknowledged he hit his head at the pool a few days before.

M.K. added that Father told him to go to the bathroom and would put fingers in his "butt" years ago for two hours at a time. He said it happened more than one time. He did not tell Mother at the time and instead told her a few months ago. Later on, M.K. changed his testimony, claiming Father put fingers in his butt almost every time he saw Father from the age of five to eight years old. When asked about the duration of this conduct, M.K. said Father "stopped, the first day" of 2023. Father's counsel inquired how M.K. remembered the specific day, and M.K. responded: "Because he just stopped." When asked how many fingers Father used, M.K. said four or five fingers. Father's counsel asked if M.K. experienced any bleeding, and he said he did not. When Father's counsel probed about the two-hour duration of the conduct, M.K. maintained that he stood touching his toes while Father's

fingers were in his butt for two hours. According to M.K., he did not have his iPad with him and did not have any conversations with Father during the entire two hours.

M.K. next testified he thought Father hit V.K. when she dropped something. M.K. did not see any hitting and V.K. never said Father hit her. M.K. just assumed Father hit V.K. because he was younger and V.K. was scared. M.K. further claimed the paternal grandmother was mean to him and hit him when he was five years old. When asked what caused the hitting, M.K. did not remember but suggested she came and hit him for no reason while he was playing with his toys. He also said he did not feel safe with his paternal aunt and uncle because they defend Father. When asked if he had seen them defend Father, M.K. said no, but he was guessing they did.

At one point, M.K. said he did not have a "bond" with Father. The court commented M.K. had a "big vocabulary" and asked if anyone told him what "bond" meant. M.K. responded he heard it used in movies.

M.K. also mentioned he was scared of being kidnapped by Father but did not think Father would kidnap him. The court asked if it was a "stranger danger kind of thing" or "about being kidnapped by strangers." M.K. confirmed the court was correct. When asked if M.K. has gotten more scared of Father in the last year than he used to be, M.K. agreed. Minors' counsel questioned why M.K.'s fears have increased even though visits with Father have stopped. M.K. responded he was scared Father would break into Mother's home. He said Father previously broke into his maternal grandmother's home around five or six years ago. Although M.K. would have

only been around two or three years old at the time, he claimed he witnessed the incident.

M.K. generally denied Mother told him what to say, claimed Mother did not talk about Father, and said he did not talk to Mother about Father or the dependency case. Finally, M.K. testified V.K. secretly communicated to Mother when they were at Father's home via a chat feature on V.K.'s YouTube channel. They used code words to refer to Father and the paternal grandmother.

B. *V.K.'s Testimony*

V.K. testified Father physically abused M.K. and detailed the "spilled milk" and sushi incidents. She said she took videos of Father hurting M.K. on her iPad, but the paternal grandmother deleted the videos. For the first time, she also claimed Father hit her on three occasions. She remembered two occasions – one when she dropped a sandwich and one time when she got an answer wrong on her iPad.

V.K. further testified she was uncomfortable when Father would lay down with her and would kiss her on the head or cheek. She noted Father's arm would be over her chest, and he was in his underwear while she was clothed. She did not like that her back was near or touching his "privates."

According to V.K., Father did not give them "real food," but she later testified he gave them spaghetti, eggs and toast, cereal, steaks on birthdays, and Romanian soup on holidays. She further testified Father left them alone at night and punished them if they did not call Mother a "whore" or "slut."

Regarding the supervised visits, V.K. testified Father "scoffed" at them and said things about Mother that made her uncomfortable. The latter

statements included Father mentioning a nearby train station was where he and Mother were previously going to buy a home and commenting he did not know Minors no longer celebrated Christmas because Mother kept switching her religion. The court asked where V.K. learned the word "scoff," and she said at school or from movies. V.K. also claimed Father was intoxicated during one of the supervised visits. V.K. further acknowledged Father sometimes took Minors out to places, including the fair and the beach. But she insisted she did not enjoy time with him.

V.K. agreed she was more scared of Father since the dependency case started even though she had not been seeing him. She was scared Father would kill them if they returned to his care. She also testified Mother told Minors she was afraid Father would hurt them on more than one occasion.

V.K. further explained she talked to Mother through a YouTube channel when she was in Father's care. Mother would post a video of their cat and then V.K. would communicate to Mother through the comments feature. In their messages, they referred to Father as "tambor" and to the paternal grandmother as "pina." V.K. said she came up with those code names, which are Spanish terms, but she could not explain why she chose those words.

Despite her YouTube communications with Mother, V.K. said Mother never talked about Father. She claimed Father and the dependency case never came up in any conversations with Mother, and even when she told Mother that Father abused them, Mother never said anything bad about Father. She likewise denied Mother told her what to say or to lie. V.K. added that she wanted to change her last name to her stepfather's name, but she denied ever talking about it with Mother or the stepfather. Finally,

13

throughout V.K.'s testimony, the court noted V.K. took multiple long pauses when asked questions about Mother.

Toward the end of V.K.'s testimony, Father's counsel requested Minors be detained from Mother due to their "emotional trauma." Counsel noted V.K. "physically harmed herself by picking at her skin to the point where she was bleeding" when asked questions about Mother. Minors' counsel also was "very concerned about . . . [Minors] being in the care of . . . [Mother]" because there was a "complete decompensation of . . . [Minors] since the case started, where they've . . . fallen apart in the care of . . . [M]other, despite . . . visits [with Father] even stopping." The court denied Father's request without prejudice.

## C. *Mother's Testimony*

Mother testified Minors told her about the "spilled milk" incident, but she had never seen Father hit Minors on any occasion. She filed a child abuse report against the paternal grandmother because M.K. came home with a scratch on his shoulder. She also filed several restraining orders against Father, which were all denied. She maintained Father threatened her with physical violence for years.

Regarding Minors, Mother testified they became afraid of Father right after Mother and Father separated and "it progressively got worse." She later said she believed Minors were doing better in her care. But she also agreed Minors were getting stomach aches, crying even though they were not seeing Father, and had an "exaggerated startle" response. Mother denied showing any fears of her own to Minors and denied telling Minors what to say.

In the middle of Mother's testimony, SSA filed an addendum report requesting to dismiss the petition and terminate dependency. SSA

14

explained it had reviewed the ongoing testimonies at the hearing and did not have sufficient credible evidence to sustain a petition. The report also noted Minors' therapist recently reported Minors appeared "to be in the middle of a high conflict family law custody case, which made its way into a dependency matter." She believed "the parents' ongoing conflicts are leading . . . [Minors] to gravitate toward a 'healthier' relationship with . . . [M]other and the stepfather." She believed V.K.'s feelings were genuine although exaggerated at times.

### D. First Social Worker's Testimony

One social worker testified he did not believe there was credible evidence to sustain the petition, and he did not believe the physical or sexual abuse allegations against Father were true. His recommendation about the case changed after witnessing testimony from the parties. He testified he had never previously recommended to dismiss a case due to a child lacking credibility in his or her reports of abuse. When asked what parts of the testimony caused him to change his recommendation, the social worker noted M.K. claimed Father had punched him when he spilled milk "and part of what the medical team relied on was him vomiting, being like sensitive to light . . . . And the child couldn't recall vomiting during that time, and he reported he only had a headache." The social worker added M.K. claimed Father inserted four or five fingers in his butt, but "[t]here was never any blood, things of that nature." Regarding V.K., he noted she seemed like she did not want to answer some of the questions.

The social worker generally was surprised M.K. shared details about the alleged sexual abuse he previously could not recall. He noted other inconsistencies such as M.K. denying going to the beach with Father when he had. He likewise was surprised by V.K.'s sexual abuse allegations against

15

Father because she had not previously reported it to SSA. The social worker also agreed the conclusion of a "CAST interview" was that they could not substantiate the physical or sexual abuse allegations.

The social worker further noted Minors claimed Father was intoxicated during a visit, but the visit supervisor had no concerns about Father being intoxicated and SSA had no concerns about Father drinking excessively or using drugs during the case. The social worker also agreed law enforcement indicated the family had a history of domestic violence and abuse without any documented evidence.

Regarding Mother, the social worker said he did not know if she was emotionally abusing Minors or trying to undermine their relationship with Father. He thought it was strange Mother would communicate with Minors through a YouTube account.

Finally, the social worker considered filing an amended petition with a new count for emotional harm and discussed the issue with his supervisor and program manager but did not file an amended petition because it was hard to determine if SSA could prove those allegations.

E. *Second Social Worker's Testimony*

Another social worker testified she thought it was possible Mother could be "coaching" Minors because "some pieces [of the case] didn't make sense," but SSA had no confirmation of "coaching." The social worker testified Father was appropriate during supervised visits, and it was concerning Mother reported to SSA that Minors were scared Father appeared intoxicated during a visit when the visit supervisor had no similar concerns. She also was surprised by V.K.'s testimony that Father physically abused her, and M.K.'s sexual abuse allegations were "out of the blue." She said it was possible someone could have suggested to M.K. to make the latter

16

allegations. Finally, she agreed Minors were increasingly upset over the course of the case regarding visits with Father.

V.

FATHER'S SECTION 350 MOTION AND THE COURT'S ORDER

At the end of the jurisdiction hearing, Father's counsel relied on section 350, subdivision (c) and requested the court follow SSA's recommendation to dismiss the petition because SSA had not met its burden of proving the allegations in the petition. SSA agreed it had failed to meet its burden of establishing jurisdiction under the petition or any alternative petition.

Minors' counsel understood why SSA recommended dismissing the petition but wished SSA had done further investigation because counsel strongly believed Mother had emotionally abused Minors by coaching them. Minors' counsel pointed to the following "circumstantial evidence" of coaching by Mother: "I've never seen a case decompensate so extremely for children since the case started. To have a 50/50 custody situation for Father go to visitation, and then the children just insisting they never like being with . . . Father and couldn't enjoy being at the beach; they weren't . . . allowed to have any joy with Father at Christmas because their religion had been changed without even discussing [it] with . . . Father; that they wanted to change their last name; that a new man in [Mother's] life they insisted was Dad now. And mainly . . . allegations that are really concerning. The YouTube videos with the secret code names . . . . These e-mails from [Mother] trying to manipulate the situation with the social workers; . . . Mother not bringing the other child to court when she knew she had to; Mother's demeanor here in the courtroom; Mother's testimony, her credibility was just

17

very sketchy at times, nonresponsive, and self-serving; her demeanor starting straight ahead the entire court proceeding, very odd and very concerning."

Minors' counsel added: "[Minors] don't have the ability to just make up elaborate lies and set up YouTube channels and change their religion and call a brand new man that they just met in [Mother's] life for a few months "Dad." They don't have the ability to do all this without somebody either strongly influencing them or actually telling them to do it." Regarding Father, Minors' counsel noted there was "nothing on Father," including no alcoholism or evidence of domestic violence.

Mother's counsel disagreed, arguing Mother's behavior at the hearing was appropriate and Minors' were finally comfortable expressing themselves because they were in Mother's sole care.

After hearing from the parties, the court dismissed the petition because there was no credible evidence supporting the allegations in the petition. The court explained it did not find Minors and Mother credible. The court noted Minors knew and repeated "particular and specific vocabulary," including "'bonding'" and "'scoff,'" which the court found unusual. The court further said Minors "presented canned, similar responses," "were quick to know dates and claimed to remember events clearly from as far back as 2017 when [M.K.] would have been 2 years old." The court added that V.K. took many long pauses when asked questions about Mother and her testimony changed from the first to second day. As to Mother, the court noted she did not answer simple questions, answered questions with another question, avoided answering, and provided evasive answers to many questions. By contrast, the court found the social workers to be highly credible.

While the court was concerned Minors may have been coached, it held there was no actual evidence of coaching. It emphasized it did not have

18

authority to initiate a dependency proceeding against a parent, and "the proper procedure [required] . . . other counsel [to] have filed a [section] 329 application requesting that petition to be filed, and if . . . [SSA] refused to do so, should have requested judicial review of that decision." The court assumed the latter procedure was not followed because there was no evidence of coaching or that Mother did the coaching.

Finally, the court noted there was evidence M.K. hit his face on the bottom of the pool around the same time as the physical abuse allegations, and the "child abuse pediatrician" could not say what caused M.K.'s injuries. The court added Father acted appropriately throughout the case and with Minors, was complaint with everything SSA requested, and was patient with visits.

Mother timely appealed.

DISCUSSION

We acknowledge this is a very unusual dependency case, but our independent review of the record has confirmed what Mother's counsel determined – there are no arguable issues for our consideration. As noted *ante,* Mother's counsel identified two issues to assist in our review: (1) whether Mother has standing; and (2) whether the evidence showed Minors were persons described by section 300.

Assuming, without deciding, Mother has standing, an appellate court must defer to the juvenile court's credibility determinations and findings of fact. (*T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 47.) All conflicts must be resolved in favor of the prevailing party below, and all legitimate inferences are indulged in support of the decision. (*In re Amy M.* (1991) 232 Cal.App.3d 849, 859-860.) We may not express an independent judgment on the evidence and uphold the court's determinations even where

19

substantial evidence to the contrary exists. (*In re Caden C.* (2021) 11 Cal.5th 614, 640.)

Here, substantial evidence supports the court's credibility findings. The record shows M.K. reported on events that would have happened when he was only two or three years old. He remembered unusual details, including specific dates, and added many new details to the alleged sexual abuse allegations at trial. Some of the latter details may not have been plausible to a trier of fact – *i.e.*, M.K.'s assertion that Father put four or five fingers in his butt for two hours at a time almost every time they saw each other, but there was no bleeding. There also was abundant evidence M.K. hit his head at a pool around the same time as the alleged incident that initiated the instant dependency case.

As to V.K., she testified Father hit her even though she had consistently reported Father only hit M.K. The record also reflects V.K. took numerous long pauses and appeared not to answer some questions regarding Mother. There were some inconsistencies in her testimony regarding her communications with Mother about Father. She used code names on YouTube to talk to Mother about Father, but she claimed Mother never talked about Father. She also said Mother never said anything bad about Father even after V.K. disclosed his alleged abuse, which the court may have found implausible given the nature of the allegations. V.K. further claimed Father was intoxicated at a visit even though the visit supervisor did not have any similar concerns. It appears V.K. also may have exaggerated some testimony about the lack of food at Father's home.

Regarding Mother, the record shows she answered certain questions with another question and provided some evasive answers. When asked if Minors ever mentioned the pool or "spilled milk" incidents since

20

M.K.'s hospital visit, Mother claimed she could not recall. The court probed whether Mother talked to Minors about the latter two incidents before the dependency case began, and Mother repeatedly testified she could not recall. Finally, the social workers testified Minors were not credible and that SSA did not have sufficient credible evidence to sustain the petition. The record also includes statements from Minors' counsel insisting Mother's testimony was "sketchy" and suggesting Minors were coached to assert "elaborate lies."

In short, substantial evidence supports the court's credibility findings, and we cannot reweigh the evidence in Mother's favor. While the resolution of this case appears unsatisfying given the general consensus that Minors' emotional wellbeing deteriorated throughout the case, there was nothing else the court could have done. SSA has discretion with the petitions it chooses to file, and it appears no party requested SSA amend the petition to include any new or additional allegations. The court could not have independently required SSA to do so.

## DISPOSITION

The appeal is dismissed.


SANCHEZ, J.

WE CONCUR:


GOETHALS, ACTING P. J.


DELANEY, J.